**FERROLINE CORP. v. GENERAL ANI-
LINE & FILM CORP.**

No. 45 C 1486.

United States District Court
N. D. Illinois.

June 13, 1952.

George I. Haight, Chicago, Ill., Carl Hoppe, San Francisco, Cal., for plaintiff.

Johnston, Thompson, Raymond & Mayer, Chicago, Ill., Brian Mannix, New York City, for defendant.

Millard C. Eiseman, Chicago, Ill., master.

CAMPBELL, District Judge.

This is an action wherein plaintiff charges defendant with wrongful appropriation and use of a secret process for the manufacture of iron pentacarbonyl claimed by the plaintiff.

The complaint alleges that, on or prior to January 4, 1938, plaintiff possessed the property rights in the secret process for the manufacture of iron pentacarbonyl, which process was kept secret from the time of the original discovery by the few persons who had knowledge of it and who were in confidential relationships with plaintiff; that the process was new and made possible the commercial manufacture of iron pentacarbonyl; that the process relates to the materials employed, to various steps in the treatment thereof, to required temperatures, to the handling of gases, to various

chemical reactions, and to other similar essentials in the practice of the process; that iron pentacarbonyl is a liquid which is valuable for various uses, e. g., in motor fuels and in the manufacture of finely powdered iron; that said process was used in plaintiff's plant at Shreveport, Louisiana and for such use it was necessary that at least one person possess knowledge of the process in order to engage in the practice of the process at said plant; that during the employment of the process by plaintiff, the secrecy in respect thereto was rigidly maintained by those possessing the requisite knowledge.

The complaint further alleges that, during the month of December, 1937, one T. E. Birbeck and one R. T. Hamilton sent an engineer to plaintiff's Shreveport plant for the purpose of learning whether the plant was in fact producing iron pentacarbonyl liquid and selling it; that the engineer ascertained such to be the fact and reported it to Birbeck and Hamilton; that, at that time, the secret process was not revealed to the engineer; that, on January 4, 1938, plaintiff entered into a contract with Hamilton, whereby plaintiff licensed him to use the process in the states of Washington, Oregon, California, Idaho, Utah and Nevada; that Hamilton, in said contract, agreed to erect a plant, manufacture an average of 200 gallons of iron pentacarbonyl daily, and to pay, as a part of the consideration to plaintiff for such license, $1.50 per standard gallon for all such iron pentacarbonyl produced; that Hamilton was authorized under the license agreement to organize a California corporation and to use the word "Ferroline" in the name thereof, and to assign the license agreement, with its privileges and obligations, to the corporation to be organized; that it was agreed that Hamilton and the corporation would keep secret the process after it should become known to them.

It is further alleged that shortly thereafter, the same engineer who had previously visited plaintiff's Shreveport plant was again sent by Birbeck and Hamilton to said plant to obtain knowledge of the process and the essential data for the erection of the proposed plant in California;

that, in confidence, plaintiff gave such information to the engineer; that Birbeck, Hamilton, the engineer and all others connected with the California corporation were made fully aware that secrecy was to be maintained in regard to the process and they agreed to do so; that said engineer was the only person connected with Birbeck, Hamilton or the California corporation technically qualified to receive knowledge of the secret process; that, pursuant to the aforementioned agreements, the Articles of Incorporation of the Ferroline Corporation of California were duly filed in that state on January 29, 1938, which Articles disclosed that the Corporation was authorized to issue stock in exchange for the license agreement; that the organization of the California corporation was completed on March 28, 1938, on which date Hamilton transferred to the corporation all of his rights under the license agreement; that the California corporation erected a plant at Los Angeles which was a substantial duplicate of plaintiff's Shreveport plant; that, in pursuance of its undertaking, the corporation kept the secret process inviolate during the time the plant was operated thereafter; that the employees in the plant were few in number, i. e., six or seven, all of whom maintained secrecy of the process; that the plant was fenced and closely guarded; that no persons were admitted to the plant except employees and such visitors as the president of the company or the engineer accompanied.

The complaint continues with the allegations that, sometime in the spring of 1939, one Dr. Hans Aickelin and one William H. von Rath, who were agents of defendant, were shown through the Los Angeles plant by the aforesaid engineer and under the authority of the president of the corporation; that, at that time, the engineer did not disclose the secret process to Aickelin or von Rath; that said agents of defendant requested samples of the product being manufactured, which samples were thereafter duly shipped to them; that, on April 8, 1940, an involuntary petition in bankruptcy was filed against the Ferroline Corporation of California and the corporation was duly declared bankrupt; that the sched-

ule of assets did not include the license agreement and plaintiff was not listed as a creditor; that, in the course of the bankruptcy proceedings, the scheduled assets of the bankrupt estate, to wit, the machinery and equipment of its plant, were sold to T. E. Birbeck, then president of the bankrupt corporation for the sum of $5,000; that, on or about June 10, 1940 and shortly prior to the purchase of equipment by Birbeck, the latter, in disregard of his agreement to maintain secrecy as to the process, disclosed in detail to one H. P. Angermueller, then an agent and engineer for defendant, the secret process and exhibited to him the practice of the process, employing the machinery and equipment used in the California plant; that, on June 26, 1940, defendant entered into a contract with Birbeck; that the said Angermueller signed such contract "for General Aniline Works"; that said contract provided for the purchase of the aforesaid machinery and equipment on the following terms; one-third of the purchase price on July 1, 1940, one-third on or before 60 days from the time of the shipment from Los Angeles of the equipment purchased, and the balance upon the erection and commencement of operation of defendant's plant in Grasselli, New Jersey; that, pursuant to the contract of purchase, the machinery and equipment was shipped to defendant, and the plant was erected and put into operation; that, under the purchase agreement, the seller agreed to procure the services of P. A. Given, who had theretofore been the engineer of Ferroline Corporation of California, for the purpose of completing the erection of defendant's New Jersey plant, and putting it into operation; that the seller also undertook to procure from Ferroline Corporation of California the agreement that said corporation would cease and refrain from manufacturing or producing iron pentacarbonyl or any derivatives thereof.

The complaint further alleges that defendant knew at least as early as the spring of 1939 that plaintiff's process was secret and was so maintained; that defendant knew of the confidential relationship between plaintiff and Ferroline Corporation of California in respect to said process; that defendant knew of the license agreement between plaintiff and Hamilton and the assignment thereof to the Ferroline Corporation of California; that it knew the acquisition of knowledge of the secret process was a breach of the undertakings between plaintiff and Ferroline Corporation of California; that defendant was on notice, or by reasonable inquiry and observation would have had notice, of plaintiff's rights in and to said process and to maintain the secrecy thereof; that plaintiff had no knowledge of the wrongful conduct of the defendant and of the disclosing of the secret process to it until within two years of the filing of the present action; that even more recently did knowledge come to the plaintiff of the purchase contract between defendant and Birbeck; that plaintiff had no knowledge that defendant was using the secret process until only a few months prior to suit, even though plaintiff made inquiry of defendant as to such fact, which information was refused by defendant; that defendant, since 1940, has been using plaintiff's secret process in the manufacture of iron pentacarbonyl; that defendant maintains great secrecy in the use of plaintiff's secret process; that, from 1940 to the filing of this action, defendant made profits in excess of two million dollars in the practice of plaintiff's secret process.

The complaint concludes with a prayer for the following relief:

(1) That defendant, having by its action assumed the contract of January 4, 1938 between plaintiff and Hamilton, be required to pay thereunder to plaintiff the sum of $1.50 per standard gallon for all iron pentacarbonyl produced by defendant;

(2) That defendant, because of its inequitable conduct in having acted as trustee de son tort for plaintiff, account to plaintiff for damages and profits accruing to plaintiff by reason of defendant's unlawful use of plaintiff's secret process;

(3) That defendant be required to account to plaintiff for damages and profits because of its unlawful interference with plantiff's contract with the Ferroline Corporation of California and said corporation's obligation to preserve, in respect thereto, the secrecy of plaintiff's process, and in

taking unto itself and using said process to its unjust enrichment;

(4) That defendant, because of its wrongful appropriation of plaintiff's property, account to plaintiff for profits and damages;

(5) That plaintiff recover from defendant its costs of suit herein and, in addition thereto, its other costs and expenses incurred or to be incurred in suit, including reasonable counsel fees in an amount to be determined by the Court and assessed as costs; and

(6) Such other and further relief as the Court deems proper.

Substantially all allegations of the complaint are denied in defendant's answer, except that defendant admits that it purchased certain iron pentacarbonyl apparatus from parties in California and that it was given information concerning the operation of the apparatus. In addition, the answer set forth the following separate and distinct defenses:

(1) The complaint fails to state a claim upon which relief can be granted;

(2) Since the year 1923 and until at least the year 1941, iron pentacarbonyl had been manufactured by a manufacturer other than plaintiff, defendant or Ferroline Corporation of California; that in March, 1940 defendant purchased from such other manufacturer a group of United States patents covering processes for the production of iron pentacarbonyl; that to induce defendant to purchase said patents said other manufacturer had, prior to March 1940, disclosed to defendant certain secret processes for the manufacture of iron pentacarbonyl; and that the processes employed by defendant in the manufacture of iron pentacarbonyl were and are those set forth in said patents and those described to defendant by said other manufacturer;

(3) That during the period from January 1927 to September 1935 various United States Letters Patent were issued covering the process of manufacturing iron pentacarbonyl; that defendant became the owner of said Letters Patent in March 1940; that plaintiff's alleged secret process was based upon, and was developed, as a result of, and while, plaintiff was engaged in the infringement of said Letters Patent, or some of them; and that plaintiff, having developed its alleged secret process by wrongfully infringing said Letters Patent, has no right, title or interest therein as against defendant, and has no right to withhold the same from defendant;

(4) All of the manufacturing data, processes and information disclosed to defendant by T. E. Birbeck, P. A. Given, Ferroline Corporation of California, or by any of the latter's officers, agents or employees were well known to defendant before such disclosure;

(5) At some time unknown to defendant prior to April, 1941, plaintiff sold its Louisiana plant for the manufacture of iron pentacarbonyl and has not, since such time and is not now, engaged in the business of manufacturing such product;

(6) At some time unknown to defendant prior to April, 1941, plaintiff sold its plant for the manufacture of iron pentacarbonyl and all of the manufacturing data and processes known to plaintiff pertaining to the manufacture of such product, and plaintiff has not since such time engaged in the manufacture of such product;

(7) Plaintiff sold its plant, data, information, discoveries and processes as aforesaid to others without imposing on those others the obligation not to disclose the same to others or to keep the same secret;

(8) In June, 1940 defendant purchased for value from T. E. Birbeck the aforementioned machinery and equipment and certain information relating to the operation of said machinery and equipment; that defendant had no notice that plaintiff or any other person had any rights or interests in the machinery and equipment or in the information, or that Ferroline Corporation of California, T. E. Birbeck, P. A. Given or any other person was under any obligation not to dispose of such machinery and equipment or to disclose such information;

(9) In June, 1940 defendant purchased from T. E. Birbeck the subject machinery and equipment and had it shipped to defendant's plant in Grasselli, New Jersey, where it was erected and put into operation by de-

fendant at great expense; that in June, 1940, defendant was given information by Birbeck and Given relating to the operation of said machinery and equipment; that defendant thereafter operated said plant, using the information disclosed to it by Birbeck and Given; that plaintiff had knowledge of said facts since June, 1940, and has delayed bringing this action for a period of five years and three months, and that, therefore, the claims set forth in the complaint are barred by plaintiff's laches;

(10) The right of action set forth in the complaint accrued more than four years next before the commencement of this action, and is barred by the applicable statute of limitations of the State of California, Code Civ.Proc. § 337, where said cause of action accrued;

(11) The right of action set forth in the complaint accrued more than five years next before the commencement of this action and is barred by the applicable statute of limitations of the State of Illinois, Ill.Rev.Stat.1951, c. 83, § 16.

Due to the complexity and number of issues created by the pleadings and to the very real possibility of consuming a disproportionate amount of available court trial time to the detriment of other pending actions, the Court was persuaded that the cause might be disposed of more expeditiously by reference to a master. An order was accordingly entered referring the matter generally to Special Master Millard C. Eiseman to hear and report. Unfortunately, however, the hope of expeditiousness was a vain one, in view of the fact that almost five years have intervened between the time of the reference and the master's final determination of the matter. The length of time consumed in litigating this matter is intolerable in itself, but is especially so since it now appears from the Court's study of the record that the Master's findings and conclusions are clearly erroneous and not supported by the evidence.

The matter is now before the Court on defendant's objections to the Master's report. Said objections—which total 123 in number—may be summarized in the following manner:

(1) The Master erred with regard to the burden of proof.

(a) The Master erred as a matter of law in holding the plaintiff was not required to prove as a part of its case that defendant acquired its knowledge of plaintiff's carbonyl process by unfair means or in bad faith (Objections 57, 85 and 90.)

(b) The Master erred in not requiring plaintiff to prove its case beyond a reasonable doubt (Objection 86.)

(c) The Master erred in holding that plaintiff had proved any of the contested elements of its case by "clear and convincing" evidence (Objection 84.)

(2) The Master erred as a matter of law in holding that each of defendant's principal iron pentacarbonyl patents is invalid. (Objections 19, 21, 22, 23, 24, 25, 26, and 27.)

(3) The Master erred as a matter of law in holding that the plaintiff was entitled to use an iron pentacarbonyl process which followed the processes disclosed by defendant's patents; and in holding as a matter of law that plaintiff's alleged process did not infringe defendant's patents; and also in holding that even if plaintiff infringed defendant's patents, plaintiff was entitled to the infringing process as against the defendant, who at all material times owned the patents thereon. (Objections 29, 30, 99, 100, 101, 102, and 103.)

(4) The Master erred in holding that plaintiff took steps to keep its "carbonyl" process secret. (Objections 9, 10, 31, 32, 33, 34, 35, 36, 37, 38, 40, 42, 88, 106, 111, and 109.) Said finding is entirely inconsistent with the Master's separate findings of fact that the plaintiff freely disclosed its process to numerous purchasers and businessmen with whom plaintiff was dealing at arm's length, including the following:

Danciger Oil and Refining Company, Octo Gasoline Corporation, Jones of St. Louis, Rogers Caldwell, Bradley Murray, Defense Plant Corporation, John Fill, Murray Goldwasser, Charles C. Neighbors and several corporations. (Objections 118, 119, 120, and 121.)

(5) The Master erred as a matter of law on the admitted facts in finding that Messrs. Hamilton, Given, Jones of St. Louis, Rogers Caldwell, Bradley Murray, Defense Plant Corporation, John Fill, Murray Goldwasser and C. C. Neighbors, were in a confidential relationship to plaintiff. (Objections 16, 17, and 41.)

(6) The Master erred as a matter of law in holding that plaintiff might maintain its present action even though it had failed to maintain the secrecy of its process, but had repeatedly disclosed the same to outsiders. (Objections 105, and 108.)

(7) The Master erred in finding that the Ferroline Corporation of California was under any obligation to the plaintiff to keep confidential the iron pentacarbonyl process. (Objections 11, 12, 104 and 122.)

(8) The Master erred in finding that Messrs. Birbeck and Given of the Ferroline Corporation of California committed any wrong toward plaintiff in disclosing to the defendant the iron pentacarbonyl process practiced by them. (Objections 43 and 104.)

(9) The undisputed evidence established that plaintiff's alleged secret process and plaintiff's plant is a mere copy of defendant's patented iron pentacarbonyl process and the Master should have so held. (Objections 4, 6, 18, 20, and 28.)

(10) The Master erred as a matter of fact and law in holding that defendant acquired parts of the California plant and plaintiff's process with actual knowledge of plaintiff's rights. This finding is clearly erroneous, is contrary to the manifest weight of the evidence, is not supported by clear and convincing evidence, nor established beyond a reasonable doubt. (Objections 53, 61, 64, 92, 94, 96 and 117.)

(11) The Master's finding of fact that defendant's agents were told by Birbeck that the California company was permitted to make carbonyl under a contract with plaintiff and of Birbeck's obligations to the plaintiff is clearly erroneous, is contrary to the manifest weight of the evidence, is not supported by clear and convincing evidence or established beyond a reasonable doubt. (Objections 45, 1, 26, 64, 93, 94, and 117.)

(12) The Master erred in finding that the defendant was charged with "notice" of the contract between plaintiff and the California company. (Objections 55, 56, 60, 62, 63 and 95.)

(13) The Master erred as a matter of law in failing to find that plaintiff was no longer owner of the process for making iron pentacarbonyl after the sale of such process to Defense Plant Corporation on April 29, 1941. (Objections 70, 71, 72, 73, 74 and 112.)

(14) The Master erred as a matter of law in failing to find that the plaintiff's claim is barred by plaintiff's laches. (Objections 75, 76, 77, 78, 80, 81 and 83.)

(15) The Master erred as a matter of law in failing to find that the plaintiff's action was barred by plaintiff's long acquiescence in defendant's use of plaintiff's low pressure apparatus. (Objections 79 and 83.)

(16) The Master erred in failing to find that defendant was a good faith purchaser of the California carbonyl process. (Objections 91, 54, 58, 59, 62, 63, 65, 74, and 96.)

(17) The Master erred in failing to find that the plaintiff's alleged secret process has been in the public domain since 1932 or earlier. (Objections 97, 98, 39, 44, 46, 48, 99, 100, 101, 102, 103, 109 and 110.)

(18) The Master erred in finding that the plaintiff has proved by clear and convincing evidence that, in the manufacture of iron pentacarbonyl, defendant was using plaintiff's alleged process instead of defendant's own process. (Objections 89, 15, 47, 49, 67, 68, 69, 113, 114 and 115.)

(19) The Master erred in recommending that the Court enter a decree finding the equities for plaintiff and ordering defendant to account. (Objections 87 and 123.)

Whether the standard of proof required in the instant case is that of "clear and convincing" evidence as set forth in Mycalex Corp. v. Pemco Corp., 4 Cir., 1947, 159 F. 2d 907, 912, or that of "proof beyond a reasonable doubt" as established in Friedman v. Washburn Co., 7 Cir., 1946, 155 F. 2d 959, 962, is of no great moment, for the reason that the Court is of the opinion that

plaintiff has failed to sustain its burden of proof by whatever evidentiary yardstick might be employed.

 Proceeding to the merits of the controversy, it should be remembered at the outset that the property in a secret process is the power and right to make use of it to the exclusion of the world. However, that property may fail to come into existence or may be lost, either through voluntary disclosure by the owner of the alleged process or because it is lawfully known or used by others in the trade. If the world knows the process, then the property disappears. There can be no property in a process and no right of protection if knowledge of it is common to the world. The Master attempts to bolster his conclusions by adopting the position, in part, that defendant's patents are invalid for failure to make adequate disclosure in conformity with the requirements of Section 33 of the Patent Laws, 35 U.S.C.A. § 33, that, therefore, plaintiff did not infringe said patents and hence, could and did develop its own secret process in the manufacture of iron pentacarbonyl. However, the prime consideration is not whether the patents are valid or invalid, but rather whether they constitute substantial prior knowledge of plaintiff's process. A chemical process of manufacturing iron pentacarbonyl is described in defendant's Patent No. 1,759,268, issued May 20, 1930 (for which the application was filed in the United States on January 29, 1925 and in Germany on February 1, 1924), which patent discloses the following:

"We have now discovered that iron pentacarbonyl compounds can be satisfactorily manufactured on an industrial scale by working in the following manner. Carbon monoxid, or gas mixtures rich in carbon monoxid, are passed over metallic iron which has been prepared by carefully reducing oxides of iron at comparatively moderate temperatures, and for reaction with the carbon monoxid a high pressure (about 50 atmospheres or more) is employed with temperatures varying between about 100 degrees and 200 degrees centigrade and a high speed of the gas current. Such a speed of the gases is employed, according to this invention, as will prevent either completely or to a substantial amount the deposition of iron carbonyl on the iron which deposition would be obnoxious to the progress of the reaction. The speed of the gas current has to be adapted to suit the pressure, temperature and activity and quantity of the iron employed in each particular case. By observing the said conditions a continuous formation of iron carbonyl is rendered possible and consequently the yields are very satisfactory. For example, the process is carried out in such a manner that the gases leaving the reaction vessel contain about 8 per cent or less, by volume, of iron carbonyl calculated as iron pentacarbonyl Fe (CO)$_5$. In order to avoid decomposition of the iron carbonyl it is advisable to cool it below about 140 degrees centigrade before releasing the pressure.

"As an example of the process according to this invention carbon monoxid is passed at 180 degrees centigrade, at a pressure of from 100 to 150 atmospheres and at a speed corresponding to 500 litres per hour (calculated on normal conditions) over 500 grammes of reduced iron which prior to the reaction had been again heated for a short time in a current of hydrogen to 500 degrees centigrade. The gas leaving the reaction vessel contains about 2 per cent, by volume, of iron carbonyl vapor and this can be condensed by cooling which is preferably done without releasing the pressure. Means for absorption, for example, highly porous coal or charcoal may also be employed. The carbon monoxid not consumed is preferably again introduced into the reaction vessel and is most suitably circulated without releasing the pressure and while adding as much fresh carbon monoxid as has been converted into iron carbonyl until it becomes necessary to supply a fresh charge of reduced iron or to renew the circulating gas owing to impurities having accumulated. The

residual gas may be utilized in a suitable way, for example for heating purposes."

The patent further states:

"The following example will serve to more fully explain a further mode of carrying out the invention, but the invention is not limited to the specific examples.

"Roasted pyrites containing about 60 per cent of iron, 3.5 per cent of sulfur and 1 per cent of copper, is freed from small-sized matter and is filled, in pieces of from pea to walnut size, into a vertical cylinder, capable of resisting high pressure, lined with copper and provided with a perforated false bottom and a suitable heating device. The oxide mass is first treated with a current of hydrogen at ordinary pressure and the temperature raised to 500 degrees centigrade until reduction is complete whereupon the temperature is lowered to about 200 degrees centigrade and carbon monoxid is passed through at a pressure of 200 atmospheres. The speed of the gas current is suitably controlled to produce a reaction gas with not more than about 6 per cent, by volume, of iron carbonyl, calculated as Fe $(CO)_5$. The gas leaving the furnace is led through one or more cooled receivers without releasing the pressure. The large mass of iron carbonyl condenses in said receivers and the remainder may be absorbed in active carbon or similar means. The residual gas is conveyed back into the high pressure furnace. The iron mass contained therein does not break asunder and accordingly there is no clogging in the furnace or in the pipings.

"When the formation of iron carbonyl diminishes considerably about two-thirds or three-quarters of the iron mass will be consumed and the mass is then replenished, or it may be found proper to apply a short reduction step to the remainder of the mass whereupon a rapid formation of carbonyl will again take place.

"Roasted pyrites may also be reduced in a separate reduction furnace; in such case, it must be reduced in a hydrogen atmosphere which thereafter is replaced by carbon dioxid in which the iron loses its pyrophoric property without becoming less suitable for the production of carbonyl. It can be transferred without injury into the high pressure furnace where it is subjected to the action of carbon monoxid."

Patent No. 1,725,619, issued August 20, 1929, teaches that in the manufacture of iron pentacarbonyl the carbon monoxide should flow downward over coarse grained iron in vertical vessels, which is a practice subsequently employed in plaintiff's process.

Patent No. 1,783,744, issued December 2, 1930, relates to the production of iron carbonyl from carbon monoxide and iron in a continuous process at low pressure from 50 atmospheres down to atmospheric. It describes the same method of manufacture, namely, the continuous circulation of the carbon monoxide at a speed sufficient to avoid the deposition of liquid carbonyl on the iron mass. The patent teaches that at such lower pressure the temperature of the reaction must also be lowered; and that oxygen, carbon dioxide and other mixtures which may exert an oxidizing action on the iron must be excluded as far as possible from the carbon monoxide, since even traces of such compounds often render the surface of the iron inactive with the carbon monoxide. This patent also states:

"It is also useful to employ iron with metallic surfaces free of any superficial coating of iron oxide, and for this purpose either any oxidation of the iron metal should be avoided prior to the action of carbon monoxide, or, if such oxidation has already occurred, the iron should be broken into pieces or the oxide should be removed by a short reducing treatment before starting with the production of iron carbonyl."

Patent No. 1,828,376, issued October 20, 1931, concerns "manufacture of iron carbonyl" and the advantages for the preparation of iron carbonyl from "iron in the form of porous lumps". The patent states:

"The employment of iron in porous lumps has of course the important advantage of allowing the gases a free passage in contradistinction to powdery iron masses".

In Patent No. 1,614,625, it is taught that, in the manufacture of iron pentacarbonyl, it is important to avoid in all parts of the apparatus in which iron carbonyl is present temperatures considerably higher than those employed for the formation of the carbonyl, so as to avoid decomposition of the carbon monoxide.

Plaintiff's alleged process is described generally in a document filed with the Master, entitled "Ferroline Process for the Making of Iron Pentacarbonyl". (The process is described in greater detail in Plaintiff's Exhibit No. 16, entitled "Report of Visit and Inspection of Plant of Ferroline Corporation of America, Los Angeles, California", prepared by one H. P. Angermueller, then an employee of defendant, on July 15, 1940.) The subject document states:

"Dry ice is converted to carbon dioxide gas. The carbon dioxide is then put through a water gas set with no steam present to form carbon monoxide. The carbon monoxide is passed through a dust filter, treated with caustic soda solution to remove $CO_2$ to assure that the CO is of a high degree of purity and then stored in a gas storage tank (gasometer).

"From the storage tank the carbon monoxide (CO) is passed to a compressor where the pressure is raised to the desired level. From the compressor the carbon monoxide gas (CO) is passed throught a condenser, a mechanical knockout and a chemical knockout (as by passing through calcium chloride) to remove impurities such as $H_2O$. The CO gas is then heated and introduced as a make up gas into a reaction cycle in such quantities and at such pressures and temperatures as the reaction cycle requires. In this cycle, the vertical reaction towers are employed which are filled with pre-crushed Swedish sponge iron or other suitable iron containing materials which are to be subjected to the reaction of the carbon monoxide (CO) gas. The air in the reaction tower and its charge is removed and is replaced by hydrogen gas.

"The iron charge therein is then treated by high temperature hydrogen in a closed cycle with the help of a suitable circulator with necessary pipe line connections. During this treatment water is formed which is eliminated by a suitable condenser, cooler and receiver. The hydrogen treatment is continued until there is no further water formation.

"The $H_2$ remaining in the system is removed and the system is then filled with the previously described CO gas under pressure and at an elevated temperature and is circulated by a cycling compressor. For example, suitable CO gas temperatures may be from approximately 150° to 380° F. while the CO gas pressure may vary from 400 to 1000 pounds per square inch.

"During this cycling process a reaction occurs between the carbon monoxide and the iron, forming iron pentacarbonyl as a vapor, which vapor, together with CO gas leaves the reaction tower. The iron pentacarbonyl vapors are condensed by passing them through a condenser and separator into a receiver for the liquid iron pentacarbonyl while the CO gases, substantially freed from the iron pentacarbonyl vapors, after being brought up to proper temperature are returned to the reaction cycle.

"Also, there is introduced with this recycled CO, fresh CO make up gas in quantities as required through the consumption of CO gas in the reaction with the iron charge.

"When the iron pentacarbonyl generation has ceased or produces little iron pentacarbonyl, the reaction tower is shut off, the CO gas is removed therefrom, and the residue iron is discharged. The reaction tower is then re-charged and the procedure described above repeated."

Considering each element of the foregoing statement individually, it can be seen that, even as of 1936, there would be nothing new, unique or secret in plaintiff's process viewing it either in its constituent factors or in its totality. Every element had been anticipated by defendant's patents or by other old, well-known procedures. The following analysis of plaintiff's statement of its process will serve to illustrate this conclusion:

1. "Dry ice is converted to carbon dioxide gas". This does not constitute a new idea. Dry ice will convert spontaneously into carbon dioxide if merely permitted to stand at room temperatures. Further, for a number of years prior to 1936, commercial equipment had been available for converting dry ice into carbon dioxide gas in pressure cylinders.

2. "The carbon dioxide is then put through a water gas set with no steam present to form carbon monoxide". This was old in the art as early as 1930; water gas sets were standard items of equipment in the manufacture of carbonated water gas and for manufactured gas in cities and industries. (A water gas set is a piece of equipment in which coke is first heated by blowing air over hot bedded coke, which brings the coke up to a high temperature. The air is then shut off from the coke bed and steam is blown in, in place of the air and the steam reacts with the hot coke, forming hydrogen and carbon monoxide. This is called water gas because it is gas made by the water. After the steam has been passed through the coke bed for a short time, the coke becomes cooled and the steam is shut off and the air is again turned on to heat up the coke by burning the coke, and the cycle is then repeated. This operation is substantially similar to the step described by plaintiff, except that carbon dioxide is used in the place of steam, and with the carbon dioxide and the coke at high temperature, it forms carbon monoxide without any hydrogen).

3. "The carbon monoxide is passed through a dust filter". This is an old process employed to remove fine particles of coke or ash, which might be carried by the stream of gases into the gas line.

4. "Treated with caustic soda solution to remove $CO_2$ to assure that the CO is of a high degree of purity". This is an old process. Caustic soda has been used for many years to remove carbon dioxide in the analysis of gases containing carbon dioxide and also for the purpose of removing carbon monoxide from gases that might contain it.

5. "And then stored in a gas storage tank (gasometer)". This has been standard procedure almost since the discovery of commercial uses for gas.

6. "From the storage tank the carbon monoxide (CO) is passed to a compressor where the pressure is raised to the desired level". The use of a compressor to increase the pressure of gas is old.

7. "From the compressor the carbon monoxide gas (CO) is passed through a condenser, a mechanical knockout and a chemical knockout (as by passing through calcium chloride) to remove impurities such as $H_2O$". This is conceded by plaintiff to be old in the chemical art.

8. "The CO gas is then heated and introduced as a make up gas into a reaction cycle in such quantities and at such pressures and temperatures as the reaction cycle requires." This phase is substantially covered in defendant's Patent No. 1,759,-268, wherein it is stated, "adding as much fresh carbon monoxide as has been converted into iron carbonyl". (Insofar as temperatures and pressures are concerned, the patents also give specific data).

9. "In this cycle, vertical reaction towers are employed". This is covered specifically by defendant's Patent No. 1,-725,619, wherein is stated, "* * * the production of iron carbonyl by the reaction of carbon monoxid with coarse grained iron under pressure is much more advantageously carried out with the carbon monoxid passed through the iron in the high pressure vessel (vertical) in a downward direction".

10. "Which are filled with pre-crushed Swedish sponge iron or other suitable iron containing materials which are to be subjected to the reaction of the carbon monoxide (CO) gas". Reference to similar materials is found in several of defendant's

patents. Specifically, Patent No. 1,759,268 mentions that "metallic iron may be prepared from iron oxid or suitable iron salts such as carbonate or oxalate. Very suitable starting materials are roasted pyrites and other materials forming stable lumps"; and Patent No. 1,828,376 which states the advantages of employing iron in the form of porous lumps as a raw material. Swedish sponge iron falls within this category, since it is reduced iron in the form of a sintered mass, which has been produced by the reduction of iron oxide without fusing or melting the iron and, therefore, it is a very spongy or porous mass of metallic iron and highly reactive.

11. "The air in the reaction tower and its charge is removed and replaced by hydrogen". The use of hydrogen in manufacturing iron carbonyl is described in defendant's Patent No. 1,759,268, where it is stated, "* * * reduced iron which prior to the reaction had been again heated for a short time in a current of hydrogen". That air should be removed from a vessel prior to the introduction of hydrogen is an elementary principle of chemistry and is a basic safety precaution.

12. "The iron charge therein is then treated by high temperature hydrogen in a closed cycle with the help of a suitable circulator with necessary pipe line connections". The quotation from Patent No. 1,759,268 in Paragraph 11, supra, is equally applicable to this statement. The same patent also states, "The oxid mass is first treated with a current of hydrogen * *". Economy of operation would demand that the hydrogen be recycled.

13. "During this treatment water is formed which is eliminated by a suitable condenser, cooler and receiver." It is a well-known chemical fact that the reduction of iron oxide by hydrogen forms water and that it is necessary to remove this water before recycling the hydrogen back to the reaction vessel for the treatment of the iron, because the hydrogen is at high temperature and the water would be present as steam, and it would be impossible to reduce the oxide if there were a large percentage of steam in the hydrogen. Hence, it is necessary to remove the water by cooling the gases through the use of a suitable condenser and then separating the liquid water so condensed from the hydrogen.

14. "The hydrogen treatment is continued until there is no further water formation". This is merely one method of saying that the treatment with the hydrogen is continued until the iron is completely reduced. Defendant's Patent No. 1,759,268 states that the reduction should be continued until it is completed, i. e., there is no more oxygen present and, hence there is no more water formed by the stream of hydrogen.

15. "The $H_2$ remaining in the system is removed and the system is then filled with the previously described CO gas under pressure and at an elevated temperature and is circulated by a cycling compressor". This is a basic chemical principle—the hydrogen must be removed before introducing the carbon monoxide, otherwise the reaction will not be the formation of iron carbonyl. The treatment of the iron with the carbon monoxide under pressure and temperature with circulation by a cycling compressor is stated in defendant's Patent No. 1,759,268: "The carbon monoxid not consumed is preferably again introduced into the reaction vessel and is most suitably circulated without releasing the pressure and while adding as much fresh carbon monoxid as has been converted into iron carbonyl until it becomes necessary to supply a fresh charge of reduced iron or to renew the circulating gas owing to impurities having accumulated".

16. "For example, suitable CO gas temperatures may be from approximately 150° to 380° while the CO gas pressure may vary from 400 to 1000 pounds per square inch". Defendant's Patent No. 1,614,625 states:

"Accordingly, when for example working under 200 atmospheres and at a temperature of about 200° C. the highest permissible temperature of the walls or the iron mass is about 250° C., while when working at a pressure of 1 atmosphere and consequently at a temperature of as low as about 50° C., the temperature should not

substantially exceed about 100 to 120° C. anywhere." Hence, that patent discloses temperatures ranging anywhere from 120 degrees Fahrenheit at 1 atmosphere pressure to 392 degrees Fahrenheit at 3,000 pounds pressure. In defendant's Patent No. 1,759,268 it is stated, "* * * and for the reaction with the carbon monoxid a high pressure (about 50 atmospheres or more) is employed wtih temperatures varying between about 100 degrees and 200 degrees centigrade and high speed of the gas current". Hence, that patent describes temperatures ranging between 212 degrees Fahrenheit and 392 degrees Fahrenheit. It follows, therefore, that the proper temperatures and pressures from 150 degrees to 380 degrees Fahrenheit, and the pressures from 400 pounds to 1000 pounds per square inch have been taught in the patents. For convenience of reference the following equivalents may be set forth— 400 pounds per square inch: 26½ atmospheres; 1000 pounds per square inch: 66½ atmospheres; 150° F.; 65° C.; 380° F.: 194° C.

17. "During this cycling process a reaction occurs between the carbon monoxide and the iron, forming iron pentacarbonyl as a vapor". This factor is stated in all of defendant's patents, and specifically in No. 1,759,268: "The gas leaving the reaction vessel contains about 2 per cent, by volume, of iron carbonyl vapor".

18. "which vapor, together with CO gas leaves the reaction tower." That statement is covered by the same patent reference set forth in Paragraph 17, supra.

19. "The iron pentacarbonyl vapors are condensed by passing them through a condenser and separator into a receiver for the liquid iron pentacarbonyl while the CO gases, substantially freed from the iron pentacarbonyl vapors, after being brought up to proper temperature are returned to the reaction cycle". Defendant's Patent No. 1,759,268 states:

"* * * and this can be condensed by cooling which is preferably done without releasing the pressure. Means for absorption, for example, highly porous coal or charcoal may also be employed. The carbon monoxid not consumed is preferably again introduced into the reaction vessel and is most suitably circulated without releasing the pressure and while adding as much free carbon monoxid as has been converted into iron carbonyl * * *". And further in the same patent:

"The gas leaving the furnace is led through one or more cooled receivers without releasing the pressure. The large mass of iron carbonyl condenses in said receivers and the remainder may be absorbed in active carbon or similar means. The residual gas is conveyed back into the high pressure furnace".

20. "Also, there is introduced with this recycled CO fresh CO make up gas in quantities as required through the consumption of CO gas in the reaction with the iron charge". This is covered in defendant's Patent No. 1,759,268, where it is stated: "The carbon monoxid not consumed is preferably again introduced into the reaction vessel and is most suitably circulated without releasing the pressure and while adding as much fresh carbon monoxid as has been converted into carbon carbonyl".

21. "When the iron pentacarbonyl generation has ceased or produces little iron pentacarbonyl, the reaction tower is shut off, the CO gas is removed therefrom, and the residue iron is discharged." Defendant's Patent No. 1,759,268 recites, "* * until it becomes necessary to supply a fresh charge of reduced iron or to renew the circulating gas owing to impurities having accumulated." The underlying facts for this statement are well known in the chemical and engineering trade, for carbon monoxide, when mixed with air, forms an explosive mixture. In addition, it is common knowledge that carbon monoxide is a poisonous compound and that it would not, therefore, be safe to release the carbon monoxide into the open working areas, even though it did not form an explosive mixture.

In view of the foregoing, it should be abundantly clear that not only did plaintiff contribute nothing new in the field of

iron carbonyl production, but that it must necessarily have borrowed substantially from the chemical lore of defendant's patents. If this were a suit brought by defendant against plaintiff for patent infringement, the Court would have no hesitancy in declaring plaintiff to be an infringer, for the conclusion is compelled that any competent engineer could, with these patents at his disposal, design, construct and operate a satisfactory plant for the production of iron carbonyl. Both plaintiff and the Master attach considerable importance to the fact that the exact temperatures and pressures employed by plaintiff in its process are not mentioned specifically in the patents, and that the patents do not mention or recommend specific temperatures and pressures. However, they lose sight of the fact that the patents do establish workable ratios and ranges of these variable factors, and that, from the patents, a temperature-pressure curve can be laid out from which a competent engineer could obtain adequate operating information. For example, the patents disclose three different points of temperature and pressure:

(1) At atmospheric pressure the temperature should be about 50° Centigrade;

(2) At 750 pounds per square inch pressure, the temperature should be 100° Centigrade;

(3) At a pressure of 3,000 pounds per square inch the temperature should be 200° Centigrade. As a practical matter, the engineer would be influenced, in his selection of temperatures and pressures, more by economic factors than by workability of the information set forth in the patents. A low pressure plant would be more desirable to one with limited capital funds at his disposal for the reason that this would permit the use of cheaper compressors and lighter and less expensive materials in the vessels and pipes required; whereas one not confronted with a financial problem at the outset would be more inclined to erect a high pressure plant because of the advantages of lower operating costs. A person intending to erect a plant at minimum cost would probably design one to operate between 500 and 1000 pounds pressure and,

having chosen this operating pressure, he could select the proper temperature by employing the pressure-temperature curve set forth in defendant's patents.

The conclusion that plaintiff's alleged process was not secret, since it fell within the realm of public knowledge, should be sufficiently dispositive of the present litigation. However, for the purpose of more completely demonstrating the error of the Master's findings, the Court will proceed to consider other objections urged in behalf of the defendant.

■ As mentioned heretofore in this Memorandum in the recitation of the allegations of the complaint, plaintiff entered into an agreement with one R. T. Hamilton, which contract was subsequently assigned to the Ferroline Corporation of California. That contract recites that plaintiff "is the owner of manufacturing, development and sales rights upon the use and exploitation of Iron Penta Carbonyl as a motor fuel improver" under an agreement between one William H. Johnsen and John F. Knox, plaintiff's secretary; and that Hamilton "is desirous of obtaining the rights, information and assistance, as well as all processes, formulae and data now in possession of Ferroline in the erection of a plant to be located on the west coast of the United States". The contract further recites that, for a consideration of $5,000, "Ferroline does hereby license the said Hamilton to use all of the rights, interests, information, data, secret processes, formulae, as well as all other rights obtained by Ferroline from and under William H. Johnsen, as well as all information, data, discoveries, improvements, made, had or ascertained by Ferroline in its experiments, exploitation and perfecting the process of manufacturing Iron Penta Carbonyl under the said contract and otherwise." The only reasonable construction that can be attached to the foregoing is that plaintiff conveyed to Hamilton only such secret processes as had been obtained from Johnsen. However, it is undisputed that Johnsen's alleged process related only to the manufacture of a compound designed as an anti-knock additive element for gasoline, of which iron pentacarbonyl

was a constituent, and not to the manufacture of iron pentacarbonyl as such.

██ Even assuming that the process referred to in the Hamilton-Ferroline contract was for the manufacture of iron pentacarbonyl, it can be seen that there is no binding contractual provision for secrecy. True, the agreement, in Paragraph 3 Section (7), reserved to plaintiff the right to sell as a whole its entire business and assets. It further provided that, in the event such sale was made more than one year after Hamilton's plant had gone into commercial operation then plaintiff might pay Hamilton double the entire investment in the manufacturing plant, but not more than $100,000, upon the payment of which Hamilton should transfer the plant to plaintiff; and in such case "the rights of Hamilton to use the processes and data for the manufacture of the products covered by this contract shall immediately cease and expire and thereafter the said Hamilton or his assigns, specifically obligates himself not to engage in the manufacture of a product covered by this contract and to thereafter use the secret formulae and processes either directly or indirectly for the manufacture of products covered by this contract". This is the only concrete provision of the contract imposing a restriction upon Hamilton's use of the information given him. However, this restriction was later nullified by deletion of Section (7) by Hamilton and plaintiff, which alteration was subsequently ratified by the Ferroline Corporation of California. As to the foregoing, the Master has this to say in Paragraph 13 of his Supplemental Report, "It is true that the contract between plaintiff and Mr. Hamilton did not specifically refer to the carbonyl process as secret, but in view of the fact that it does refer to the carbonyl process, the tenor of the contract and the situation and purposes of the parties, the master holds that this contract should be construed as imposing the obligation of secrecy on Mr. Hamilton and his assigns."; and further in Paragraph 135, "It is a fact that the only express restriction in the contract between plaintiff and Mr. Hamilton relative to Mr. Hamilton's use of formulae and processes was expressly deleted after the signing of the contract by an amendment, but the evidence also shows that this was done at the insistence of the officers of the State of California in charge of corporations, who insisted upon its deletion before issuing the corporate charter or permitting it to sell stock. In any event, as heretofore pointed out, the Master concludes that in view of the situation of the parties and the general tenor of the contract, such deletion was immaterial.". As to Paragraph 13 it may be commented that it is the general rule that where there is an express agreement between parties covering the subject matter, the law will not imply one. If the parties to the agreement saw fit to provide secrecy as to the fuel compound, there was nothing to prevent them from making a similar agreement as to the process of manufacturing iron pentacarbonyl. The same rule is applicable to Paragraph 135, and in addition it should be noted that it makes little substantial difference as to the reasons underlying the deletion of the secrecy provisions in the contract—the important fact is that they were deleted and, hence, no longer existed.

██ As to the issue of whether or not plaintiff disclosed its process to others without imposing a requirement of secrecy, the Master makes the following finding: "It is true that during the time that plaintiff was making carbonyl and thereafter, various peoples were admitted to the plant and learned how the process operated. These people, according to the record, were the following: Messrs. Hamilton and Given who were associated with plaintiff's licensee, Ferroline Corporation of California; others were associated with Danciger Oil & Refining Co., Okto Gasoline Corporation, one 'Jones' identified only as being from St. Louis, Rogers Caldwell, Bradley Murray, Defense Plant Corporation, a few of the principal stockholders of plaintiff and Messrs. Fill, Goldwasser and Neighbors who were associated with Metallurgical products, Micro Products or Ferrocart Corporation (all companies controlled by Mr. Harry A. Ford). All of these individuals and companies were in confidential relationships to plaintiff. * * * Moreover,

the disclosures to Fill, Goldwasser, Neighbors and officials of Defense Plant Corporation, which were never passed on except to higher officials of those corporations, occurred after June, 1940, when plaintiff's process was wrongfully disclosed to defendant by Mr. Given. The fact of such disclosure, therefore, cannot be used as a defense."

■ This is a fairly imposing array of people to whom the alleged secret process was disclosed. It should be noted that the Master does not find as a fact that plaintiff revealed the process to them only after exacting a pledge of secrecy, but relies rather on the simple assertion that they were all in confidential relationships with plaintiff. But what are the bases for the so-called confidential relationships? It appears that several of them arose out of plaintiff's attempts to sell its plant, equipment and processes. For example, on June 29, 1939, plaintiff entered into a contract with Rogers Caldwell whereby plaintiff sold to Caldwell its entire plant and equipment and "all rights of whatever character or nature owned by Ferroline, whether by patent right, license or other right to manufacture and sell iron pentacarbonyl" for any purpose whatsoever. (The contract was subsequently cancelled on March 18, 1940.) The contract contains no provision describing any process as secret or requiring either party to keep any process secret. Furthermore, there is no evidence in the record of any verbal agreements to maintain secrecy in regard to the process. Again in 1940, plaintiff entered into negotiations with one Jones from St. Louis for the sale of the plant. The sale was never executed, but Jones acquired considerable information as to the process. There is no testimony in the record indicating a verbal agreement that Jones maintain secrecy in regard to the process. There were other complete disclosures of the process during the course of contracts of sale of the plant, but occurring after the alleged revelation of the process by Given to defendant. The Master takes the position that these disclosures will not retroactively validate the disclosure to defendant. Conceding for the sake of argument, that the

Master's stand on this point is correct, there still remain the disclosures made to Caldwell and Jones prior to the alleged disclosure by Given to defendant. Furthermore, the readiness to disclose the process to the later purchasers without exacting promises of secrecy may be taken as an indication of plaintiff's general attitude toward the process, i. e., plaintiff never regarded the process as secret and took no steps to protect it. In addition, it should be remembered that the mere relationship of buyer and seller does not in itself create a confidential relationship. True, such a relationship may be established through the medium of verbal understandings, but here, not only is there no testimony that conversations occurred in regard to maintenance of secrecy, there is positive testimony that the conversations did not take place. Accordingly, no confidential relationship and no requirement of secrecy was established by any competent proof.

■ In regard to defendant's acquisition of plaintiff's alleged secret process, the Master adopted the view that defendant was required, and failed, to prove affirmatively that it acquired the process in good faith. The Court is of the opinion that the Master thereby cast the burden of proof upon the wrong party. The proper rule of law is that an inventor has no exclusive right to the use of his unpatented process, but rather his sole right is to prevent anyone from obtaining such process through breach of trust or contract. It follows, therefore, that the burden should have been cast upon plaintiff to prove not only that those in confidential relationships to plaintiff disclosed it to defendant, but, in addition, that defendant learned the secret dishonestly or as a knowing participant in a breach of trust or a breach of contract. In any event, the basis for the Master's conclusion that defendant had actual notice or knowledge of plaintiff's rights in regard to the process is extremely tenuous, to say the least. The Master's finding on this point is: "Mr. Birbeck testified that during the course of the conversation he told Dr. Aickelin of California Company's connection with and obligation to the plaintiff". No great weight

should be attached to Birbeck's testimony on this point because:

(a) Dr. Aickelin was deceased at the time of such testimony;

(b) Birbeck had a percentage interest in any judgment that might be entered against the defendant; and

(c) the quality of the statement on this point, i. e., Birbeck's sole statement was, "That we had paid good money to the Ferroline Corporation of Shreveport for the privilege of making this carbonyl; that we were under obligation to them and we were going to make it." This casual remark, interjected as it was into an argument as to whether the California Company's process infringed defendant's patent, could hardly serve as notice that the process was secret and that Birbeck was bound, by contract or confidential relationship, not to divulge it.

The Master further attempts to support his findings in regard to defendant's alleged bad faith by asserting that defendant had constructive notice of plaintiff's rights. However, the facts on which the Master bases this conclusion, considered either individually or collectively, are neither conclusive nor persuasive. For example, the filing of the Hamilton contract with the Secretary of State of California was not notice since it was not recorded pursuant to a statute requiring the public to take notice of the matters recorded; a reference in a letter from Birbeck to Dr. Aickelin to "my associates" conveyed little or no information as to anybody's rights; and the appearance of Knox's initials on certain manufacturer's blueprints of the apparatus purchased by defendant from Birbeck is certainly innocuous. It should be readily apparent that the circumstances were not such that an inquiry became a duty by a person of ordinary care and prudence, and the failure to make such inquiry a negligent omission.

A more valid example of notice of a type sufficient to put a person upon inquiry is found in plaintiff's reaction, or rather lack of it, to the news that defendant had purchased all of the machinery and equipment of the California plant. The Master's Report itself highlights this. It is stated therein:

"As heretofore pointed out, the contract between Mr. Birbeck and defendant effecting the sale to the latter was executed June 26, 1940. The detailed disclosure of the process was made by Mr. Given to Mr. Angermueller a few days prior thereto.

"On July 10, 1940 Mr. Birbeck wrote to Mr. J. F. Knox (defendant's exhibit 21) as follows:

"Ferroline financial troubles out here finally engulfed us to the point where all of our assets were sold under bankruptcy proceedings on June 18th and the property acquired by the General Aniline Works of New York. * * * You probably know that General Aniline is controlled by the I. G. people and the latter's patents have been turned over to the General Aniline. It is their intention, I am informed, to use such of our equipment as they can fit into their plans, making a nominal amount of carbonyl initially and then go into the powder business in a big way. * * *"

"On January 27, 1941 Mr. Birbeck wrote to Mr. Blocker (defendant's exhibit 24) in part as follows:

"'* * * Due to financial difficulties we were unable to proceed with the result that the physical assets of the plant were sold under bankruptcy proceedings and later acquired by the General Aniline Works. The General Aniline crowd know how to make carbonyl and always did.'

"Mr. Knox testified (R. 434, 569, and 573) that it was his understanding from Mr. Birbeck's letters that defendant had purchased only the physical assets, and since he knew that defendant had acquired the patents on the high pressure process, it never occurred to him that the defendant was interested in learning plaintiff's process.

"In the latter part of the summer of 1942, Mr. Given told Mr. Blocker in Shreveport that he had disclosed plaintiff's process to Mr. Angermueller in June, 1940. That was the first time Mr. Blocker had any reason to believe

that defendant had acquired anything more than the physical assets and Mr. Blocker was very much shocked (R. 652, 653; R. 174).

"In July or August, 1945, Mr. Blocker employed Carl Macbroom to go to Grasselli and find out whether defendant was using plaintiff's process (R. 673). Mr. Macbroom reported (R. 676) that the defendant was, in fact, using plaintiff's process, and Mr. Blocker then instructed his attorneys to file suit, which was done September 5, 1945.

"The defense of laches and acquiesces (sic) are not valid, since any change of position on the part of defendant occurred between the date it learned the process and March 19, 1941, when the Grasselli plant started operation."

That plaintiff was well aware of the fact that defendant intended to use the purchased equipment in the manufacture of iron carbonyl, there can be no doubt. However, in addition to this, plaintiff should have realized that a process, substantially identical to plaintiff's alleged process, would necessarily have to be employed in order that the equipment be of any value to defendant. Throughout this entire proceeding, the plaintiff has taken the position—and the Master has agreed—that the prime distinctive features of its process were low temperatures and pressures, and that the process disclosed in defendant's patents necessarily involved operating pressures of 3,000 pounds per square inch. But the undisputed testimony reveals that the maximum pressure at which plaintiff's apparatus could be safely operated was 1,000 pounds per square inch. Such fact should certainly have put plaintiff upon inquiry, regardless of whether it had actual knowledge of a revelation of the process by one of the California Company's employees to defendant. Plaintiff did nothing, however, nor did it do anything for some three years even after Given, in the summer of 1942, informed Mr. Blocker that he had revealed plaintiff's process to Mr. Angermueller in June, 1940. Instead, plaintiff stood idly by, permitting defendant to pay the balance of the purchase price for the equipment, and to design and construct a complete plant of its own, with the attendant expenditure of considerable amounts of money, time and engineering skill. Plaintiff's conduct was so grossly negligent and inequitable that it is now estopped to assert its claim in a court of justice and equity.

The Court is further of the opinion that the plaintiff as of the time of the commencement of the instant action and as of the present time, neither possessed nor owned an interest in the alleged secret process, sufficient to entitle it to maintain this suit. In a rather devious contractual arrangement, plaintiff undertook to dispose of its assets to Defense Plant Corporation, a division of the Reconstruction Finance Corporation. Simultaneously, a contract was executed, on April 29, 1941, between plaintiff and Metallurgical Products, Inc., wherein the latter undertook to pay plaintiff a royalty of 25¢ per gallon of liquid carbonyl produced. (It will be remembered that plaintiff was under an obligation to pay such a royalty to William Johnsen and to Bradley Murray). Paragraph 5(a) of the contract between plaintiff and Metallurgical Products recites:

"Ferroline Corporation shall transfer, or has already transferred to Defense Plant Corporation, a division of the Reconstruction Finance Corporation, the entire plant, equipment, processes, and all other rights connected with said plant, for the price and sum of Fifty Thousand Dollars ($50,000.00), paid by the said Defense Plant Corporation to the second party, receipt of which is hereby acknowledged. Second party does further specifically acknowledge that in making the said transfer to the Defense Plant Corporation for the consideration of $50,000, that the title has passed or shall pass to said Defense Plant Corporation, free and clear of any lien of any character whatsoever that it may have legally or equitably, or otherwise, by reason of any additional or further consideration to be paid to it by the first party or its assigns." It is further recited in the same contract that, "Nothing herein shall in any manner be construed as retaining or creating in favor of either party to this contract, any

reservation, claim, lien or right of any character whatsoever either legal or equitable, in and to the plant, equipment, etc., transferred by second party to Defense Plant Corporation, it being the intention of both parties hereto that the said Defense Plant Corporation shall acquire by said deed a full, free and clear title to said property for the consideration of fifty thousand dollars so paid or to be paid by the said Defense Plant Corporation at the time of the execution of said deed." Unfortunately, for the purposes of clarity, the plaintiff conveyed by deed to the Defense Plant Corporation all of its interest in its plant "together with any other machinery or equipment or other property located in the buildings or on the land described under 1 above".. Subsequently, on May 5, 1945, Metallurgical Products, Inc., reconveyed to plaintiff all that the former had received under the April 29, 1941 contract, reserving, however, the rights and properties acquired by the Defense Plant Corporation. The tenor of the circumstances surrounding the execution of these instruments 'compels the conclusion that it was intended that the Defense Plant Corporation should acquire the processes as well as the buildings, machinery and equipment. It is reasonably certain that the Defense Plant Corporation would take a dim view of the contention that it had expended $50,-000 for property it had no right to use. In any event, it is manifest from the record in this case that the process was actually turned over to the Defense Plant Corporation which manufactured, or at least attempted to manufacture, with the help of a former officer of plaintiff, iron carbonyl in limited quantities. Conceding that the deed of conveyance from plaintiff to Defense Plant Corporation did not purport to deliver the iron carbonyl process, the contract between plaintiff and Metallurgical Products, Inc., logically can be construed as a promise for the benefit of a third person, i. e., Defense Plant Corporation, whereby the latter acquired the right to the process. The rule is that a contract, in which anything is stipulated for the benefit of a third person, who has signified his assent to accept it, cannot be revoked as to the advantage stipulated in his favor without his consent. Since Defense Plant Corporation at no time consented to the reconveyance of rights by Metallurgical Products, Inc., to plaintiff, its rights remained unaffected and it alone would possess the authority to maintain the present action.

On December 22, 1950, the defendant presented to the Court a proposed supplemental answer, setting up an affirmative defense of unclean hands on the part of plaintiff, on the ground that one of plaintiff's witnesses—Birbeck—testified that he was promised a percentage of any judgment recovered against defendant. The matter was briefed and, on April 5, 1951, the Court by minute order denied leave to the defendant to file such supplemental answer. The Court is frank to concede that the principal motivation in denying leave was to expedite disposition of this long-pending litigation. The same defense is again urged by defendant in support of its objections to the Master's report. Since all the testimony pertinent to this point was received by the Master, no prejudice can inure to either party by the Court's reconsideration of the matter.

▮▮▮▮ The Court is of the opinion that the defense of unclean hands cannot be sustained. It appears from the record that Birbeck testified that the aforementioned Hamilton promised him a portion of Hamilton's recovery. There ·is, however, no evidence of authority from plaintiff to Hamilton to make such an assignment. Furthermore, even conceding that plaintiff had made the promise to Birbeck, it does not follow necessarily that plaintiff has been guilty of unclean hands. True, the general rule is that a contract to give testimony for a compensation contingent on the outcome of the case is illegal, but that rule generally restricts only the enforceability of the contract by the soliciting party. It does not, however, require a court of equity to deny relief to one of the contracting parties unless there has been an adequate showing of corrupt intent, and no such intent has been demonstrated in this action. Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co., 6 Cir., 1938, 95 F.2d 978. In other words the equitable

maxim requiring clean hands is applicable only where the party seeking relief has been guilty of some unconscionable conduct as, for example, where such party has induced a witness to testify falsely or has procured the suppression of evidence, which was the situation existing in the leading case on this subject—Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293. See also 14 C.J.S. Champerty and Maintenance, § 23, p. 367, and 30 C.J.S. Equity, § 95, footnote 42, p. 483.

There is no more validity in defendant's contention that it is now using a process substantially different from plaintiff's than there is in plaintiff's assertion that its process does not fall within the scope of the disclosures contained in defendant's patents. To be sure, in each instance there are distinguishing elements, but only as to mechanics and not as to substance. Each process finds its ultimate source in the German discoveries which are to be found in the patents presently owned by defendant.

The evidence does not sustain defendant's affirmative defense of the Statute of Limitations, nor does defendant urge such defense in its objections to the Master's report.

From the foregoing, it is abundantly clear that substantially all of defendant's objections to the Master's report must be sustained, and that judgment should enter in favor of said defendant.