**FERROLINE CORP. v. GENERAL ANILINE & FILM CORP.**

No. 10700.

United States Court of Appeals, Seventh Circuit.

Oct. 21, 1953.

Rehearing Denied Dec. 7, 1953.

George I. Haight, William J. Marshall, Jr., Chicago, Ill., Carl Hoppe, San Francisco, Cal., for appellant.

Edward R. Johnston, James A. Sprowl, and Wesley G. Hall, Chicago, Ill., and Herbert L. Abrons, New York City, for appellee.

Before MAJOR, Chief Judge, and DUFFY and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

In its complaint plaintiff charged defendant with the wrongful appropriation and use of its allegedly secret process for the manufacture of iron pentacarbonyl and sought damages resulting therefrom. The trial resulted in judgment for defendant, 107 F.Supp. 326 from which plaintiff appeals.

Plaintiff averred that it developed a process for commercial production of iron pentacarbonyl, which it kept secret; that on January 4, 1938, it licensed Ferroline Corporation of California to use the process and made full disclosure to the licensee, imposing on the latter and its employees the obligation to keep and use the information in confidence, and that thereafter, Birbeck and Given, employees of the licensee, in breach of confidence, disclosed plaintiff's process to defendant, who, with knowledge of plaintiff's rights and knowingly participating in the breach of confidence, received the knowledge thus imparted and adopted and used it in the construction and operation of a plant employed in production of iron pentacarbonyl. It is finally averred

that plaintiff first received notice that its process had been wrongfully disclosed to defendant some two years prior to filing suit, and that it did not learn that the process was being used by defendant until a few months prior to filing this action.

Defendant denied many of the averments, but admitted that it had purchased certain technical productive apparatus from the California parties and that it had been supplied with full information as to the use of the equipment purchased. In addition the answer set forth certain separate defenses as follows:

(1) The complaint does not state a claim warranting relief;

(2) Defendant, as assignee of certain prior patents, follows only the processes disclosed in them;

(3) Plaintiff's process infringes the patents; therefore, plaintiff is not entitled to assert it against defendant;

(4) Prior to bringing the action, plaintiff conveyed its processes to others, and is not now engaged in manufacture;

(5) Plaintiff disclosed its process to the public;

(6) Defendant purchased the process from Birbeck in good faith;

(7) Plaintiff's claim is barred by laches.

The cause was referred to a special master, who, in his report found the equities to be with plaintiff and recommended that defendant be ordered to account. Sustaining some 84 of defendant's 126 objections, the court held the findings and conclusions covered thereby clearly erroneous and dismissed the cause for want of equity. Ferroline Corporation v. General Aniline & Film Corporation, 107 F.Supp. 326.

### Motion to Dismiss the Action.

Defendant has filed a motion to dismiss the action because of the alleged unclean hands of plaintiff. It first invoked this defense in 1950, relying then upon the admissions of Birbeck who had been called as a witness for plaintiff in 1946. His cross-examination revealed that he claimed to have been promised by one Hamilton a contingent share of what was said to be Hamilton's interest in what still another party, Johnsen, was said to be entitled to get out of plaintiff's recovery. Four years later, defendant sought leave to file a supplemental answer pleading the additional defense of unclean hands. Its petition was denied. The defense was renewed on review of the master's report. The District Court concluded that it could not be sustained for the reason that no corrupt motive on the part of plaintiff was shown, relying upon Goodyear Tire & Rubber Co. v. Overman, 6 Cir., 95 F.2d 978. In its present motion to dismiss the action on the doctrine invoked, defendant relies also upon so-called admissions of plaintiff's counsel in final argument in the District Court.

An agreement to pay a witness other than an expert, compensation contingent on the outcome of litigation is contrary to public policy and void. Alexander v. Watson, 4 Cir., 128 F.2d 627; Van Norden v. Metson, 75 Cal.App.2d 595, 171 P.2d 485; Goodrich v. Tenney, 144 Ill. 422, 33 N.E. 44, 19 L.R.A. 371; Gillett v. Board of Sup'rs of Logan County, 67 Ill. 256; Williston on Contracts, Sec. 1716 (Rev.1938). However, in the present case, the testimony of Birbeck contained no express statement or implication that plaintiff had ever authorized Hamilton to make any arrangement with Birbeck. There is no proof that Hamilton had ever been promised anything by plaintiff. The only fact to which Birbeck testified was that a third party, who is dead, had promised him a share of what the third party said he was to receive from still another third party, Johnsen, who is likewise dead, a part of what Johnsen had said he hoped to get out of what plaintiff might recover. In this situation the court held properly that no corrupt motive on the part of plaintiff was shown.

True it is that admissions of fact by counsel during the course of a

trial are binding on the party whom he represents. Oscanyan v. Arms Co., 103 U.S. 261, 26 L.Ed. 539. Here, however, irrespective of whether the closing argument can properly be considered a part of the record, it seems to us that what was said in argument must be attributed solely to the ardor of Mr. Hoppe, a zealous advocate, who was not under oath and who should not be considered as having offered testimony or a mature considered admission against his client. Oral argument, such as we have here, we think, does not come within the category of deliberate admissions of record during the trial. Counsel was not a witness; he was an advocate who had had no part in the negotiations with Birbeck and whose good faith defendant itself does not attack. The circumstances are such that we conclude that no binding effect should be charged against plaintiff for what amounted, at the most, to excessive zeal upon the part of its counsel in the heat of argument.

Furthermore if plaintiff were substituted for Hamilton in such an arrangement for the production of Birbeck's testimony as to be illegal, that fact would not destroy plaintiff's cause of action. It would, under certain circumstances, invalidate the agreement so far as the parties thereto are concerned. That the cause of action (of one not a party to the contract) is not destroyed is apparent from Henderson v. Kibbie, 211 Ill. 556, 71 N.E. 1091; Oil, Inc. v. Martin, 381 Ill. 11, 44 N.E.2d 596.

### Findings and Conclusions.

To avoid possible confusion, Ferroline Corporation of Louisiana plaintiff herein is referred to only as plaintiff. The word "Ferroline" when unqualified, is used to denote the Ferroline Corporation of California. The product involved, iron pentacarbonyl, hereinafter referred to as carbonyl, is a yellowish liquid derived from the reaction of certain types of porous iron with carbon monoxide. Its chief commercial value lies in its use as an intermediate product in the manufacture of powdered iron, which, in turn, is a vital element in the production of radio cores and radar. It is useful to some degree also as a desulfurization agent for petroleum products and as an antiknock gasoline additive.

Carbonyl was first discovered in Germany in 1891. An efficient process for its commercial production, however, eluded those engaged in research for many years, until a fortunate incident, in an experiment conducted by one Mueller, produced a half-liter of the liquid. This paved the way for future experiments by Mueller and others connected with the I. G. Farbenindustrie Aktiengesellschaft, hereinafter referred to as Farben. Eventually a number of domestic and foreign letters patent, covering the process or various of its specific phases, were granted and assigned to Farben, who, in the early 1920s, constructed a plant at Oppau, Germany, where it has since produced substantial quantities of the product. Farben also holds a number of domestic and foreign patents covering the production of iron powder, which are involved in this controversy only incidentally.

Briefly, the salient facts which gave rise to this dispute are as follows. In the early 1930s one William Johnsen developed an additive designed to raise the octane rating of gasoline, which employed carbonyl as its basic ingredient. In 1936, he entered into an agreement licensing Knox to manufacture the compound, in consideration for which the licensee agreed to construct and operate a plant, to pay Johnsen a royalty on all carbonyl produced, and to keep the process secret.

Shortly thereafter plaintiff was incorporated under the laws of Louisiana, and the contract assigned to it by Knox. Plaintiff employed one Leahy to design and construct its plant. The master found that Leahy was familiar with the patents and the literature bearing on the art and sought to build a non-infringing mill at Shreveport. He designed equipment which employed carbon monoxide temperatures and pressures beyond those

disclosed in the patents. This machinery produced carbonyl, but in disappointing quantities. However, Leahy did construct a pilot plant which produced carbonyl at what the master found to be the equivalent of commercial production.

Thereafter, through an arrangement with the Danciger Oil & Refining Company, plaintiff employed one of the latter's chemists, Levine, who was familiar with the art, to design a plant. Levine sketched a "flow sheet" (diagrammatic layout) of the proposed equipment. In accord with this, the Shreveport plant was reconstructed under the supervision of Levine and Knox. Some changes in equipment and process, suggested by Knox, were necessary before satisfactory production was achieved. Successful operation was commenced in 1937 and continued intermittently for several years.

Carbonyl, as previously stated is produced by the reaction of certain types of porous iron with a stream of carbon monoxide, under carefully regulated temperatures and pressures. Farben operates its Oppau plant under a CO pressure of up to 3000 pounds per square inch and at relatively high temperatures. Plaintiff's operation employed CO pressures of up to 1000 pounds per square inch, with correspondingly low temperatures. These relatively low pressures and temperatures are the chief factors of what is claimed by plaintiff as its secret process.

In January, 1938, plaintiff entered into an agreement with one Hamilton, whereby, in consideration of $5000 and his promise to construct a plant and to pay royalty on all compound produced, plaintiff gave him a license to manufacture the Johnsen product in certain enumerated states. This composition was referred to as secret in the Hamilton contract, of which the Johnsen-Knox contract was made a part.

Thereafter Ferroline was incorporated in California, and the Hamilton contract assigned to it. Plaintiff supplied Ferroline with flow sheets and other technical data disclosing the details of construction and operation of its Shreveport plant. Knox, an officer of plaintiff, drew blueprints and specifications for the fabrication of reaction towers and other equipment, and plaintiff sent two of its employees to California to give technical assistance and advice in constructing and putting into operation Ferroline's factory. Ferroline's Given went to Shreveport, spent several days inspecting plaintiff's equipment and was thoroughly briefed by Knox on all phases of plaintiff's carbonyl operations. A plant was constructed at Los Angeles, and production of carbonyl commenced under the direction of Birbeck and Given, Ferroline's vice president and chief engineer, respectively. Carbonyl, due to certain fouling propensities, proved unsatisfactory as a gasoline additive. Consequently Ferroline's plant operated intermittently. Financial difficulties beset the company.

Chemnyco, Inc., was at this time, Farben's American agent for the negotiation of licenses of the Farben patents. One Simrall and, later, Birbeck, opened negotiations with Mueller, then employed by Chemnyco, for a license to enter the field of iron powder production under the patents. This license was ultimately denied. Thereafter, Chemnyco, prompted by the outbreak of war in Europe which threatened to cut off domestic supplies of iron powder, acted as intermediary in procuring in 1940, for defendant, licenses to use the Farben processes for carbonyl and iron powder production. In addition the patents were assigned to defendant.

Birbeck, having learned of the assignment of the patents to defendant, corresponded with Mueller seeking an arrangement whereby Ferroline might produce carbonyl for sale to defendant. As a result, defendant's Dr. Aickelin and vom Rath proceeded to Los Angeles and, accompanied by Birbeck and Given, inspected Ferroline's plant; but the hoped-for arrangement to produce carbonyl for sale to defendant did not materialize. A chief by-product of iron powder production is carbon monoxide, an essential compound in carbonyl production. Con-

sequently, in order to insure economical operation, a powder plant and one producing carbonyl should be located in close proximity to each other in order that the carbon monoxide released in powder production may be reclaimed and readily supplied for use in the carbonyl plant. Defendant decided to locate its powder mill at Grasselli, New Jersey, and to construct its own carbonyl factory in conjunction therewith.

The parties ultimately adopted a second suggested course, viz., that defendant purchase the Ferroline equipment. Much of the mechanism needed for carbonyl production must be especially fabricated, and, under wartime shortages and restrictions then existing, certain of the equipment needed by defendant could be procured, if at all, only after long delay. Accordingly, defendant sent its chief engineer, Angermueller, to Los Angeles to inspect the Ferroline set-up and to negotiate a contract for the purchase of so much of the equipment as he might think usable and suitable for translocation. He had examined the Farben blueprints and the written descriptions of the Farben process before he went to California. Angermueller spent several days with Given at Ferroline's place inspecting the equipment and operating data. Given explained the operation of each piece of equipment and the details of the Ferroline process. Angermueller took extensive notes and drafted two flow sheets, the first showing the plant's layout, and the second, certain suggested mechanical changes therein, and reported fully to defendant. Complete information relative to the equipment and process was supplied to Angermueller with Birbeck's knowledge and consent.

Thereafter, on June 26, 1940, a contract was entered into between Birbeck, as vendor, and defendant, as purchaser, whereby, for $22,000, Birbeck agreed to sell the Ferroline equipment deemed practicable to move. Angermueller signed on behalf of defendant, with one reservation, viz., that the fabricator's blueprints of the equipment and the operating data and records of Ferroline be delivered to defendant as part of the bargain.

Meanwhile unknown to defendant, Ferroline had been adjudicated bankrupt on April 30, 1940, and its assets sold on June 19, 1940 to Birbeck for $5000. Although the machinery and equipment were listed as assets in the bankruptcy proceeding, the license from plaintiff was not scheduled and the court file made no reference to plaintiff as a creditor or to any contract with plaintiff. The uncontradicted evidence tends to prove that, in purchasing the property and in the subsequent sale to defendant, Birbeck acted on behalf of the creditors and stockholders of Ferroline and that the proceeds of sale were employed in the payment of its obligations.

Pursuant to the agreement of sale, the equipment, records and technical data were shipped to defendant and turned over to it, whose engineers spent some six months designing a new plant. Most of the Ferroline equipment, with some modifications, together with mechanism from other sources, was employed in its construction. The mill commenced operation in March, 1941, and, since that time, has been producing carbonyl. Mueller entered defendant's employ in February, 1941, and was assigned to the development of the carbonyl processes.

Plaintiff participated from time to time in negotiations with others for the sale of its physical property and processes for making carbonyl. Thus one Bradley Murray, the Danciger Oil & Refining Company, Okto Gasoline Corporation, one Jones and one Fill were at different times admitted to plaintiff's plant and briefed in at least some phases of its process prior to the time when Birbeck and Given disclosed it to defendant. Thereafter, disclosures were made to certain representatives of one Ford and Metallurgical Products, Inc. On this phase of the case the master found that a confidential relationship existed between plaintiff and the various parties at the time when plaintiff disclosed its

process to them. We remark, in passing, that, as this finding is supported by substantial evidence, the trial court erred in sustaining objection thereto and in entering a contrary finding. Arrow Distilleries, Inc., v. Arrow Distilleries, Inc., 7 Cir., 128 F.2d 841.

On April 29, 1941, plaintiff entered into a three way transaction with Defense Plant Corporation and Metallurgical Products, Inc., in the form of a contract with Defense Plant Corporation, whereby plaintiff conveyed its physical property to that corporation, a lease, whereby Defense Plant leased the property to Metallurgical and a license agreement, whereby plaintiff, for a stated royalty, gave Metallurgical a license to use plaintiff's carbonyl process. Metallurgical then went into possession of the plant and attempted, without success, to operate it in producing carbonyl and iron powder. Thereafter, Knox took charge of the plant and employed Ferroline's former engineer, Given, to attempt "to get plaintiff back into the carbonyl field". We find no evidence to support the master's finding that "plaintiff's lack of success in reentering" the field of carbonyl production was largely due to defendant's actions. This finding was clearly erroneous and was properly rejected by the trial court. Carter Oil Co. v. McQuigg, 7 Cir., 112 F.2d 275.

In the fall of 1942, Defense Plant cancelled its lease to Metallurgical and employed defendant to move the equipment to the Huntsville, Alabama, arsenal and to use it there in constructing a reserve carbonyl and powder plant. Thereafter, on May 5, 1945, plaintiff entered into a "cancellation of royalty agreement" with Metallurgical, whereby, for $10, the latter returned to plaintiff all of its rights under the agreement, but expressly reserved all property which had been transferred to Defense Plant Corporation.

Findings of fact by a master are binding on the trial court unless clearly erroneous. F.R.Civ.P. 53(e) (2), 28 U.S.C.A. The threshold question here then is the same as it was in the court below,—whether, as a matter of law, the master's findings of fact were clearly erroneous. Even where, as here, the oral testimony is largely uncontradicted, the trial court must respect the advantage the master enjoyed when he saw and heard the witnesses and was thus enabled to judge of their veracity and credibility. Santa Cruz Oil Corp. v. Allbright-Nell Co., 7 Cir., 115 F.2d 604. Neither the trial court nor this one may refuse to recognize the findings "merely because of a difference in personal persuasion * * * or a dissatisfaction with the result reached." Sanitary Farms Dairies v. Gammel, 8 Cir., 195 F.2d 106, 118; Webb v. Frisch, 7 Cir., 111 F.2d 887.

Since our jurisdiction rests on diversity of citizenship, under the doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the law of the forum, Illinois, is determinative of the substantive issues, including the issue of conflict of laws. Smith v. Dravo Corp., 7 Cir., 203 F.2d 369. The action here sounds in tort, the liability for which the courts of Illinois determine by the law of the place of the wrong. Smith v. Dravo Corp., supra. This is New Jersey, for it was there that defendant appropriated the information received to its benefit, and, allegedly, wrongfully to plaintiff's detriment.

The requirements of a claim of this nature in New Jersey are clear from two opinions of its courts. In Club Razor & Blade Mfg. Corp. v. Bindzsus, 131 N.J.Eq. 283, 25 A.2d 31, the court said, in part: "One who invents or discovers and keeps secret a process of manufacture, * * * has a property therein which this court will protect against one who, in violation of contract or breach of confidence, undertakes to apply it to its own use or to disclose it to a third person. Salomon v. Hertz, 40 N.J.Eq. 400, 2 A. 379." 25 A.2d at pages 33–34. In A. Hollander & Son, Inc., v. Imperial Fur Blending Corp., 2 N.J. 235, 66 A.2d 319, the court, defining the re-

strictions on use, by a stranger, of secret information, said: "The protection afforded \* \* \* [trade secrets] extends against third persons who, *knowing of the employee's obligation,* may profit from his disclosure. \* \* \* A stranger and its employees may be enjoined where, with *knowledge of the employee's covenant and in violation thereof,* the stranger applies to his own use the property of the complainant. \* \* \*" 66 A.2d at page 326. (Emphasis supplied.) See also Carver v. Harr, 132 N.J.Eq. 207, 27 A.2d 895; Stone v. Goss, 65 N.J.Eq. 756, 55 A. 736, 63 L.R.A. 344; Boost Co. v. Faunce, 17 N.J.Super. 458, 86 A.2d 283. It appears then that the essential elements of a claim of this nature against a third person in New Jersey are: (1) existence of a trade secret, (2) a substantial element of secrecy preserved, (3) disclosure to someone under an express or implied obligation to preserve secrecy, (4) disclosure by that person in breach of confidence, (5) to a third party who acquires the information with knowledge of the claimant's rights therein and (6) use by the third party to the detriment of plaintiff. The master resolved all these elements in plaintiff's favor.

### (1) Existence of a Trade Secret.

■■■■ Secrecy is the basis of plaintiff's claim. Here evidence tends to prove that many months and much labor were expended by plaintiff in developing a successful carbonyl process, involving complicated chemical and mechanical problems. Defendant contends, however, that this process was merely that disclosed in the Farben patents, and constitutes an infringement of those patents. Obviously, the determinative question in this respect is not the validity of the patents, as the master apparently believed, but whether plaintiff's alleged secret process, in all its details, is disclosed in the patents or in prior art teachings. If all essential details have been disclosed, the process has become a part of the public domain and can not be claimed by plaintiff as its property. Smith v.

Dravo Corp., supra; Carver v. Harr, supra. Although the inference from the evidence that many major elements of plaintiff's process are shown in the prior art teachings is tenable, the combination of these elements into a complicated production process amounted to a trade secret, Stone v. Goss, supra, if the combination of the interrelated parts represented a valuable contribution arising from plaintiff's independent efforts. Smith v. Dravo Corp., supra. Here the master has found, and the evidence supports the finding, that the process as a whole was the product of plaintiff's efforts, differing materially from any methods taught in the prior art. The trial court could not, and this court may not, disturb that finding.

Defendant's second contention in this connection, in keeping with its fifth and sixth affirmative defenses, is that plaintiff conveyed all its rights in its process to Defense Plant, and thus has retained no interest therein which this court may protect. This presents two questions: (1) whether property rights in a trade secret may exist without the claimant's actual use of the secret information, and (2) what is the effect of the conveyance to Defense Plant, the lease from Defense Plant to Metallurgical and plaintiff's license agreement of even date to Metallurgical.

■■■ Though there is respectable authority to the effect that a plaintiff must be employing a trade secret before he can maintain a suit for its wrongful appropriation and use, Victor Chemical Works v. Iliff, 299 Ill. 532, 132 N.E. 806; Bristol v. Equitable Life Assurance Society, 132 N.Y. 264 30 N.E. 506, we find nothing to persuade us that the courts of New Jersey adopt this view. Their decisions speak of "discovery" and "maintaining secrecy" as the only requisites for existence of a trade secret. Club Razor & Blade Mfg. Corp. v. Bindzsus, supra; Boost Co. v. Faunce, supra. Consequently we find no justification for disturbing the master's resolution in favor of plaintiff in this respect.

We do not consider it necessary to delineate all the rights and obligations of the parties created by the conveyance to Defense Plant, the lease from the latter to Metallurgical and plaintiff's royalty agreement with Metallurgical. Even if construed together, these contracts spell out, in unambiguous language, the intention of all parties thereto that the conveyance to Defense Plant was to include plaintiff's process as well as its plant and equipment, in view of the nature of the property right here involved, this construction, of itself, neither precludes plaintiff's right to maintain this suit nor renders the royalty agreement void. We are dealing with a type of intellectual property,—in effect, a property right in discovered knowledge. Although the courts speak of a property in trade secrets, this right is not absolute, but it is one which will be protected against those who have acquired the knowledge wrongfully. Stone v. Goss, supra; Irvington Varnish & Insulator Co. v. Van Norde, 138 N.J.Eq. 99, 46 A.2d 201, reversing 137 N.J.Eq. 134, 43 A.2d 805; Stewart v. Hook, 118 Ga. 445, 45 S.E. 369, 63 L.R.A. 255. In view of the evidence we must sustain the master's conclusion that plaintiff possesses an enforcible right and interest in its process.

### (2) Maintenance of Secrecy.

Irrespective of whether we would find as the master did, his finding that secrecy was maintained is supported by adequate substantial evidence, and the trial court could not and we may not rightfully reject it.

### (3) Disclosure in Confidence.

Whether a confidential relationship between plaintiff and Ferroline existed may be determined largely by reference to plaintiff's license to Hamilton which was later assigned to Ferroline. The Hamilton c ntract refers to the Johnsen formula as secret. By reference, the Johnsen-Knox license agreement is a part of the Hamilton contract. The only express restriction on the use of any process by Hamilton or his assignee, Ferroline, was subsequently deleted by written agreement of the parties. However, the master inferred an obligation of secrecy on the part of Hamilton and Ferroline from the fact that the contract "does refer to the carbonyl process, the tenor of the contract and the situation of the parties * * *." The trial court rejected this finding, holding that, as the contract expressly provided secrecy only as to the anti-knock compound, no further restrictions were implied. We think the trial court ruled correctly on this feature. Although a confidential relationship may be implied in a proper case, Smith v. Dravo Corp., supra; Allen-Qualley Co. v. Shellmar Products Co., D.C., 31 F.2d 293, affirmed, 7 Cir., 36 F.2d 623; Heyden Chemical Corp. v. Burrell & Neidig Co., 2 N.J. Super. 467, 64 A.2d 465, where there is an express agreement between the parties covering the subject matter, the law will not create another by inference. Martin v. City of Port Huron, 6 Cir., 111 F.2d 759; Walker v. Brown, 28 Ill. 378; Taylor Iron & Steel Co. v. Nichols, 73 N.J.Eq. 684, 69 A. 186, 24 L.R.A.,N.S., 933. As previously noted, there was no oral testimony which supported a finding of disclosure in confidence by the master. Thus, he was in no better position than the court below to determine the issue, and no presumptions prevail in favor of his finding. Carter Oil Co. v. McQuigg, 7 Cir., 112 F.2d 275.

### (4) Disclosure by Birbeck and Given in Breach of Confidence.

What we have just said with reference to the non-existence of a confidential relationship, precludes any breach of confidence in the disclosure of plaintiff's process to defendant.

### (5) Defendant's Knowledge of Plaintiff's Rights.

The conclusion is inescapable that the master misplaced the burden of proof in adopting the view that defendant was required to prove, affirmatively, that it acquired the process in

good faith. The only protection equity affords the possessor of a trade secret is to prevent its use by those who obtain the secret information in breach of contract or of a fiduciary relationship, and by third parties who knowingly participate in such breach. A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., supra; Stone v. Goss, supra; Boost Co. v. Faunce, supra. It follows, therefore, that plaintiff should have been required to prove affirmatively that defendant acquired its knowledge as a knowing participant in a breach of trust. The master's conclusion with respect to this issue is based in part on his findings that defendant paid no consideration for the process and that it acquired no legal title thereto. This we think was plainly erroneous. The gravamen of a cause of action of this nature is wrongful appropriation. One who obtains secret information honestly may use it freely. See, e. g. Irvington Varnish & Insulator Co. v. Van Norde, supra; Carver v. Harr, supra.

The master's finding that defendant had actual notice of plaintiff's rights, is likewise clearly erroneous and was properly rejected by the trial court. The interested Birbeck testified that during the course of the visit of vom Rath and Aickelin to the Los Angeles plant the latter charged Ferroline with infringement of the Farben patents. Birbeck's rejoinder was "that we * * * paid good money to Ferroline Corporation of Shreveport to make this carbonyl; that we were under obligation to them and were going to make it." This testimony is not supported by Given, and vom Rath expressly denied that such a statement was ever made. Both Given and vom Rath were present when Birbeck claims he made these assertions in what was described in the testimony as a small room. The statement is further weakened by the fact that it related to a conversation with Aickelin, who was deceased at the time it was given.

The master considered also, in this respect the circumstance that the fabricator's blueprints for the Ferroline equipment bore the legend, "O. K., J. F. Knox". Given testified that he had told Angermueller who Knox was, and informed him that Ferroline got its plant from plaintiff. However, it should be observed that these blueprints bore also the name of the fabricator who had built the equipment, and that Angermueller, during his inspection of the Ferroline plant, questioned the fabricator by telephone as to tensile strength, etc., of the apparatus.

We do not think the evidence in this respect justifies a finding that defendant had actual notice of plaintiff's rights in the process. There is no other evidence that defendant, at the time of its transaction with Birbeck, even knew of plaintiff's existence.

We find no case in which the New Jersey courts have imputed actual knowledge without convincing proof. Stone v. Goss, 65 N.J.Eq. 756, 55 A. 736, was an action against a third party who lured away certain of plaintiff's employees for the express purpose of acquiring plaintiff's trade secrets. Where the designer of a blackout screen employed an independent contractor to construct the screens for him, and the contractor employed the information so acquired to his own use, the court refused to enjoin in the absence of an express agreement not to compete. Carver v. Harr, 132 N.J. Eq. 207, 27 A.2d 895. With these two exceptions, trade secret litigation in New Jersey has been restricted to the employer-competing former employee situation. Boost Co. v. Faunce, 17 N.J.Super. 458, 86 A.2d 283; Art Wire & Stamping Co. v. Johnson, 7 N.J.Super. 173, 72 A.2d 523, and other cases cited in those noted. The tenor of these cases, impels the conclusion that the New Jersey courts are reluctant to extend their protection to trade secrets in the absence of a conclusive showing that the defending party's acquisition and use thereof are wrongful. Carver v. Harr, supra; Boost Co. v. Faunce, supra. As stated by the court in the latter case, in the absence of an agreement between the parties to the litigation "there must be a strong case

before the court will enjoin the use of information honestly obtained." 86 A.2d at page 285. In view of these announced principles we conclude that the chance remarks allegedly made to defendant's employees by officers of Ferroline are not sufficient to support a finding of actual notice.

The master bolsters his conclusion in this respect by finding that defendant was charged with constructive notice of plaintiff's rights. This is based on: (1) registration of the Hamilton contract with the Secretary of State of California, (2) the contract of sale to defendant by Birbeck personally of equipment installed in Ferroline's plant, (3) the secrecy surrounding the Los Angeles plant, viz., "peeping tom" fence, enclosure of all equipment behind closed doors, etc., (4) exclusion of the carbonyl process from the schedule of assets in bankruptcy, and (5) a reference in a letter from Birbeck to Dr. Aickelin that he could not "speak for all of his associates * * *".

The short determinative comment as to these circumstances as evidence is: (1) registration of the contract was not notice of its provisions, in view of the absence of a statute requiring the public to take notice of the matters recorded, Bank of America National Trust & Savings Ass'n v. National Funding Corp., 45 Cal. App.2d 320, 114 P.2d 49; (2) assuming that failure to schedule the carbonyl process as an asset of Ferroline in bankruptcy was sufficient to put defendant on notice of plaintiff's rights, this schedule expressly disavowed Ferroline's possession of property held for others; and (3) all other outward signs pointed to Ferroline's ownership, with no hint of interest in any other person.

■ Plaintiff argues further that Ferroline held this process in tenancy, and that, therefore, its possession was notice of plaintiff's rights in the process. Assuming that this rule applies to trade secrets, possession by a tenant is notice only of rights inconsistent with the title of the apparent owner, who, in this instance, was Ferroline. Wood v. Price, 79 N.J.Eq. 620, 81 A. 983, 38 L.R.A.,N.S., 772.

#### (6) Use by Defendant.

The record contains conclusive proof that defendant makes use of many elements of plaintiff's process at its Grasselli plant.

#### Laches.

■ We conclude also that the judgment should be affirmed on the ground that plaintiff's claim is barred by laches. As early as July, 1940, plaintiff's officers, Knox and Blocker, were informed by Birbeck that defendant had purchased the Ferroline equipment for use in the production of carbonyl. Knox testified that he knew at that time that defendant was the assignee of the Farben patents but assumed that it would employ the Farben process in its operation. But Knox had designed the Ferroline equipment and knew that its maximum usefulness was at 1000 pounds pressure per square inch. It is difficult to believe that, knowing this, he assumed defendant would employ the equipment so designed at a pressure of 3000 pounds, for he knew that defendant, if it used the Ferroline equipment at all, would necessarily employ only 1000 pounds pressure or less. This knowledge, we think, imposed a duty on plaintiff to inquire whether defendant was employing its process. Having failed so to do, its action, filed some four years after defendant had expended large sums in putting its plant in operation, is barred by laches. Benson v. Dempster, 183 Ill. 297, 55 N.E. 651; Globe Ticket Co. v. International Ticket Co., 90 N.J. Eq. 605, 104 A. 92, 106 A. 891.

We conclude that, though plaintiff had a valid process, maintained in secrecy and disclosed to Ferroline, that disclosure was not in confidence, and, therefore, that Ferroline's disclosure to defendant, in turn, was not in breach of confidence, and that defendant was not charged with notice of plaintiff's rights but has made use of the process free of any right of plaintiff to complain. We conclude also that plaintiff's suit is barred by laches.

The judgment is

Affirmed.

On Petition for Rehearing.

Although reargument of the issues of the case at bar, previously resolved against plaintiff, comprises a large part of the extended petition for rehearing, plaintiff has so zealously presented its contentions that we have thought it well to re-examine carefully the questions raised and to give the parties our reasons for our decision on this petition.

Existence of a Confidential Relationship.

Plaintiff first contends that our conclusion that the disclosure by plaintiff to Ferroline was not in confidence overlooks the controlling law and is contrary to the evidence supporting the Master's finding that a confidential relationship existed. It argues that a fiduciary relationship is implied in every royalty agreement, that the law of California is controlling on this issue, citing George v. Haas, 311 Ill. 382, 143 N.E. 54, that the cases relied on by the court are not controlling and that the finding by the Master of a confidential relationship is not clearly erroneous. With the exception of the issue as to conflict of laws, therefore, this is merely a repetition of arguments previously made and rejected.

The analogy sought to be drawn between the case at bar and Hollywood Motion Picture Equipment Co. v. Furer, 16 Cal.2d 184, 105 P.2d 299, is too broad to be decisive or even persuasive. The complaint in that case charged that plaintiff, the inventor of a special type microphone, engaged defendant to manufacture dies for castings therefor; that he delivered certain patterns to defendant under an agreement that the latter would use them and the dies only to produce such microphones as plaintiff should order, and that defendant was producing and selling such devices in breach of the agreement. The court, finding that there was no question of trade secrecy involved, held that defendant was a bailee of the patterns for a specific use, and that the complaint stated a good cause of action for damages and for an injunction against any other use of the property by the bailee. This decision can not be construed as holding that the California courts recognize a bailment of intellectual information, as such, apart from its express embodiment in tangible chattel form.

■ Assuming plaintiff's contention that the law of California is determinative of this issue [1] to be sound, the cases from that jurisdiction cited by it do not aid its cause. It is true that a confidential relationship may be implied in a proper case from the nature of a contract, Jones v. Ulrich, 342 Ill.App. 16, 95 N.E.2d 113, or from the acts and conduct of the parties under an agreement before any controversy arises, Universal Sales Corp. v. California Press Mfg. Co., 20 Cal.2d 751, 128 P.2d 665, but we find no case supporting a covenant by implication governing a subject matter covered, in whole or in part, by an express covenant. Plaintiff, relying on the fact that the Hamilton contract is a royalty agreement, contends that a confidential relationship between the parties thereto must be implied. The cases cited by it do not support its argument. Extensive review of these is unnecessary. But we observe, for example, that Empire Steam Laundry Co. v. Lozier, 165 Cal. 95, 130 P. 1180, 44 L.R.A.,N.S., 1159, involved a contract of employment containing an express covenant by the employee not to compete with his principal after termination of the employment relationship. The courts, in the other cited cases, were concerned with contracts which were completely silent as to the relationship between the parties thereto, thus paving the way for the admission of extrinsic evidence to show the intent of the parties. See, e. g., Universal Sales Corp. v. California Press Mfg. Co., supra; Gloria Ice Cream & Milk Co. v. Cowan, 2 Cal.2d 460, 41 P.2d 340; Matzen v. Horwitz, 102 Cal.App.2d 884, 228 P.2d 841;

1. Confusion reigns as to what conflicts rule the courts of Illinois apply in the interpretation of a contract. See, II Beale, Conflict of Laws, Sec. 332.21.

Barnes v. Cahill, 56 Cal.App.2d 780, 133 P.2d 433.

■ Thus plaintiff's argument ignores the basis for our decision on this issue, namely, that "where there is an express agreement between the parties covering the subject matter, the law will not create another by inference." This basic principle has been repeatedly applied by the courts of California. Thus in Loyalton Electric Light Co. v. California Pine Box & Lumber Co., 22 Cal. App. 75, 133 P. 323, 324, the court said "Where parties have entered into written engagements which industriously express the obligations which each is to assume, the courts should be reluctant to enlarge them by implication as to important matters. The presumption is that, having expressed some, they have expressed all, of the conditions by which they intended to be bound." " 'Courts cannot make for the parties better agreements than they themselves have been satisfied to make or rewrite contracts because they operate harshly or inequitably as to one of the parties.' " Cousins Investment Co. v. Hastings Clothing Co., 45 Cal.App.2d 141, 113 P. 2d 878, 881, quoting 12 Am.Jur. 749. See also, Stockton Dry Goods Co. v. Girsh, 36 Cal.2d 677, 227 P.2d 1, 22 A.L. R.2d 1460; Foley v. Euless, 214 Cal. 506, 6 P.2d 956.

■ We conclude that our decision finds ample support in the California authorities. Since the Hamilton contract specifically imposed secrecy with respect to the Johnson formula only and not with respect to plaintiff's carbonyl process, in view of the deletion of paragraph 7 from the contract, which expressly restricted the use by Ferroline of the latter process, the presumption controls that the parties have expressed all their provisions as to the subject matter of secrecy controls. There was, therefore, no valid basis for the admission of extrinsic evidence relating to this subject matter. United States Building & Loan Ass'n v. Salisbury, 217 Cal. 35, 17 P.2d 140.

This question depends solely upon the interpretation to be given a written contract. In unambiguous language the agreement defines the obligations of the respective parties; therefore there was no question of fact for the Master as plaintiff contends, despite any inadvertent language in the opinion. The conduct of the parties under the contract and the terms of the Bradley-Murray contract, which allegedly was "annexed to" the contract between Hamilton and plaintiff, are evidentiary matters *de hors* the instrument which are inadmissible in the absence of ambiguity on its face. U. S. Building & Loan Ass'n v. Salisbury, supra.

### Defendant's Knowledge of Plaintiff's Rights.

Reduced to essentials, plaintiff's argument with respect to this issue is (a), that the court overlooked evidentiary facts corroborating the oral testimony of notice to defendant; (b), that there was no proof of good faith; (c), that this court erred in ruling on the credibility of the witnesses; and, (d), its principal contention, that the court misconstrued the law of trade secrecy as developed by the New Jersey decisions. The first two of these postulates are repetition of arguments previously advanced and will be dealt with somewhat summarily.

The oral evidence alluded to is the testimony of Given and Birbeck as to conversations had with Angermueller and Aickelin respectively in which the latter were informed that Ferroline received its plant and processes from plaintiff. Plaintiff directs attention to defendant's knowledge that technical data is necessary to produce carbonyl and that use of such technical data is frequently licensed under a royalty agreement, and argues that the parallelism between the terms of the Hamilton agreement and those of the one between defendant and Farben is of probative value and that defendant's knowledge that Ferroline maintained the process in secrecy at its plant, the inadequacy of the purchase price for valuable informa-

tion and the fact that defendant purchased the equipment and information from a stranger to the apparent title all constituted evidence corroborating the testimony of Given and Birbeck.

It will be observed that the only new assertion, not taken into account in our opinion, is the possible corroborative value of defendant's knowledge with regard to the need for and use of technical data. Obviously, any value this would have in supporting plaintiff's proof of notice depends on an assumption that defendant is chargeable with notice of the Hamilton license agreement. As the opinion points out, this is refuted by the California authorities.

The record discloses the following direct testimony bearing on the issue of notice: 1, Birbeck's testimony of a conversation with Dr. Aickelin that Ferroline got the process from plaintiff, and 2, Given's statement that he told Angermueller that Ferroline got its plant from plaintiff. Considered with the factors recited as corroborating evidence, this proof falls far short of that which the New Jersey courts seem to require. See cases discussed, infra, and those cited in the original opinion.

We find nothing in the reargument of the good faith contention requiring extended comment. Plaintiff has yet to cite a single authority which removes the burden of proving bad faith from the plaintiff in trade secrecy litigation. The cases now cited are good law in the field in which they arose, but plaintiff supplies us with no bridge for the gap between the burden which a plaintiff must sustain to prove a prima facie right to recover on a negotiable instrument and the proof required in trade secrecy litigation. Culhane v. Rockford Finance & Thrift Co., 7 Cir., 74 F.2d 1; Palo Alto Mutual Building & Loan Ass'n v. First National Bank, 33 Cal.App. 214, 164 P. 1124. Plaintiff has failed to present a convincing argument that the burden should be cast on defendant to prove its good faith.

In only one respect can the court possibly be charged with ruling on the credibility of the witnesses. That is with regard to the witness Birbeck. In view of the fact that he was presented as a disinterested, or even hostile witness, who, during the course of his testimony, appeared to claim a contingent interest in plaintiff's cause of action, and in view of the fact that the crucial testimony on this issue related to a conversation with a man who was then deceased, this court is certainly competent to conclude that this, in the absence of other direct proof, will not support a finding of notice without infringing the Master's prerogative as judge of credibility. Given's testimony was by deposition, and therefore the Master was in no better position than the trial court or this court to judge of his credibility.

True it is that Vom Rath testified that he learned of plaintiff's existence in the latter part of 1940 through a conversation with one Mullaly who stated he was trying to "sell their [plaintiff's] product." And Birbeck testified that, during his negotiations with Mueller in the latter part of July, 1939, he told the latter that Ferroline had purchased the right to manufacture carbonyl from plaintiff. This testimony is immaterial upon the notice issue. The former conversation took place in the course of an unrelated conversation several months after defendant acquired its knowledge of plaintiff's process from Ferroline and began constructing its plant. As to the latter, Mueller was at that time associated with Chemnyco, and entered defendant's employ for the first time on February 14, 1941, about one month before its carbonyl plant was put into operation.

Plaintiff's principal contention relates to the imputation of actual knowledge of a breach of a fiduciary relationship to a third party who deals with the fiduciary. Specifically it challenges the statement in the opinion that no case is found in which the New Jersey courts have imputed actual knowledge without convincing proof, and cites numerous cases which, it is asserted, have held a third party liable in trade secrecy litigation in the absence of proof of good faith.

Not only do these cases not support the contention, but they tend to support our reasoning.

For example, plaintiff relies principally on Vulcan Detinning Co. v. American Can Co., 72 N.J.Eq. 387, 67 A. 339, 342, 12 L.R.A.,N.S., 102. In that case, Vulcan, largely through the efforts of one Assman and another, obtained a secret process for detinning scrap, and for many years maintained a virtual monopoly in that field. Assman was one of its directors, a member of its executive committee and an express trustee of one of four written copies of its process. Thereafter, Assman resigned his position, and was employed immediately as president of the newly organized American Can Company. The court found that he was "the leading spirit" in adapting American's plants to the use of Vulcan's processes. Several of Vulcan's employees were hired to aid in the necessary construction. There was some indication that one of these, one Egbert, after entering the employ of American, stayed on at Vulcan's plant to report on the details of new construction and improvements in the process, although there was no specific finding on this. For the purpose of enjoining American from further use of the process, the court held that the knowledge of Assman was imputable to it, and the cause was remanded for an accounting. When the case again came before the Court of Errors and Appeals to review the accounting, despite the language and holding of its previous decision, the court held that no fraud was imputable to American until actual notice of Assman's fraud was proved. An accounting was ordered only from the date Vulcan's bill was filed, at which time American had received actual notice of Vulcan's rights. Vulcan Detinning Co. v. American Can Co., 75 N.J.Eq. 542, 73 A. 603.

In Stone v. Goss, 65 N.J.Eq. 756, 55 A. 736, 63 L.R.A. 344, the defendant, Grasselli Chemical Company, had tried unsuccessfully to obtain plaintiff's secret formula for a depilatory by analyzing its product. Thereafter, an agent of Grasselli contacted Goss, plaintiff's employee, and arranged an interview for him with Grasselli's officers. As a result of this meeting Goss left plaintiff's employ and went to work for Grasselli. For several weeks, his only duty was to answer questions put to him by Grasselli's supervisor with respect to plaintiff's process. Then he was assigned the task of setting up a plant employing plaintiff's process. Thus it appears that the third party was an active participant in the fraud.

In Maas & Walstein Co. v. Walker, 100 N.J.Eq. 224, 135 A. 275, affirmed mem. 102 N.J.Eq. 328, 140 A. 921, Walker, the president of plaintiff corporation, absconded with certain of plaintiff's records and copies of its secret formulae for the manufacture of varnish and entered the employment of the third party defendant. On finding that defendant had tried unsuccessfully to obtain plaintiff's formulae by analyzing its products, had "bought out" one Thomas, an employee of another competing firm, in a fruitless attempt to obtain varnish formulae, and had employed two other of plaintiff's employees who were close associates of Walker, and on the strength of certain correspondence in evidence which tended to prove that defendant was a knowing participant in the fraud, the court found that Walker and the others were employed by defendant for the express purpose of acquiring plaintiff's trade secrets.

In Heyden Chemical Corp. v. Burrell & Neidig Inc., 2 N.J.Super. 467, 64 A.2d 465, and Vander May v. Schoone-Jongen, 128 N.J.Eq. 336, 16 A.2d 198, affirmed mem. 130 N.J.Eq. 227, 21 A.2d 819, the supposed third parties enjoined from using the plaintiffs' trade secrets were corporations composed solely of former employees of the respective plaintiffs. In Flexmir, Inc., v. Herman, 138 N.J. Eq. 594, 49 A.2d 489, the third parties held liable for wrongful use of trade secrets were a corporation composed solely of three of plaintiff's employees who opened a competing business in breach of an express covenant, members

of the immediate families of the wrong-doing employees, two partnerships composed of such family members and organized secretly after the action was filed and a temporary injunction issued, and a former customer of plaintiff's who participated actively in the fraud from its outset. In Silbros Inc., v. Solomon, 139 N.J.Eq. 528, 52 A.2d 534, the only question before the court was the enforcibility of a covenant not to compete against a former employee. Apparently the third party named in the bill did not appear to defend. In A. Hollander & Sons Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 66 A.2d 319, Singer, employed by plaintiff under an express covenant not to compete, while remaining on plaintiff's payroll, organized the predecessor to Imperial and gave plaintiff's trade secrets to it. The court treated the third parties as the alter ego of Singer. In Abalene Exterminator Co. v. Oser, 125 N.J.Eq. 329, 5 A.2d 738, the defendants were a former employee of plaintiff, his brother and a partnership composed of these two. There was proof that the employee's knowledge of plaintiff's customer lists and other documents was discussed before the competing business was organized, and that this fact influenced the brother to participate in the venture. Salomon v. Hertz, 40 N.J. Eq. 400, 2 A. 379, arose on a motion to dissolve a temporary injunction, and, therefore, was not considered on the merits. The court held that a complaint which alleged that two of complainant's former employees "had made an arrangement to enter" the employ of a competitor stated a good cause of action to enjoin them from disclosing complainant's trade secrets.

Thus, if any fault is to be found with the sentence, "trade secret litigation in New Jersey has been restricted to the employer-competing former employee situation," it is a fault of expression, not of interpretation of the authorities. We did not intend to imply that no third parties were parties to this litigation, but, when read in context, to indicate that, with the two exceptions noted, such

litigation had grown out of the wrongdoing of a former employee, under circumstances which clearly indicated that the third party was an active and knowing participant in the fraud, or acted with knowledge thereof.

The reputed parallelism between these cases and the case at bar disappears completely with respect to this issue. As evinced by the Vulcan cases, the New Jersey court, while willing to impute notice to a third party corporation for the purpose of enjoining further use of secret information gained through the fraud of its president, refused, notwithstanding the agency principle of implied knowledge, to impute fraud to the corporation for the purpose of an accounting except on proof of its actual knowledge of the injured parties' rights. It is clear that the decision of each case discussed depends on the strength of the proof made by the complaining party, not on the weakness of the defendant's proof.

### Laches.

Plaintiff ignores the undisputed facts on which this issue was resolved against it. Instead its argument is a plea that the burden should not be placed on a defrauded party to ascertain immediately that it has been defrauded. That this begs the issue is apparent.

It contends, however, that the Illinois courts will stay the running of the bar of limitations in a fraud case until "the party defrauded has knowledge of the actual and complete facts." This contention presumes the existence of fraud on the part of defendant. Furthermore, we do not understand that the Illinois authorities support this stark assertion. Although the isolated language of certain Illinois opinions may tend to support the proposition that a party affected by a fraud is excused from the exercise of due diligence, Penn v. Fogler, 182 Ill. 76, 108, 55 N.E. 192; Wilson v. Augur, 176 Ill. 561, 571, 52 N.E. 289; State Bank & Trust Co. v. Commercial Trust & Savings Bank, 300 Ill.App. 435, 448, 21 N.E.2d 157, later decisions of the court repudiate this extreme view. Thus,

**930**

in Skrodzki v. Sherman State Bank, 348 Ill. 403, 181 N.E. 325, 327, the court stated that "the rule that the statute begins to run only from the discovery of the fraud does not apply when the party affected by the fraud might with ordinary diligence have discovered it." Again, in Klee v. Chicago Trust Co., 365 Ill. 354, 358, 6 N.E.2d 442, 444, it is said that "the tendency of courts in recent years has been to hold the plaintiff to a rigid compliance with the law which demands, not only that he should have been ignorant of the fraud, but that he should have used reasonable diligence to have informed himself of all the facts." Quoting Pomeroy's Equity Jurisprudence. See also, Village of Dolton v. Harms, 327 Ill.App. 107, 63 N.E.2d 785; Pelcak v. Bartos, 328 Ill.App. 435, 446, 66 N.E.2d 465. Our decision of this issue is, we think, consistent with the principle announced in these cases.

Other contentions are disposed of, we think, in our discussion herein. The petition for rehearing is denied.