In the Matter of **VERNON HILLS, INC.,** a corporation, Debtor (two cases).

**SERVICE SAVINGS AND LOAN ASSO-CIATION,** Petitioner-Appellant,

v.

Charles David **MALEY,** Trustee-Appellee.

**ILLINOIS CAPITAL INVESTMENT CORPORATION,** Petitioner-Appellant,

v.

Charles David **MALEY,** Trustee-Appellee.

Nos. 14854, 14855.

United States Court of Appeals Seventh Circuit.

July 14, 1965.

Richard Weinberger, Joseph Z. Willner, Allan R. Bloch, Chicago, Ill., for appellant.

Herbert L. Stern, Jr., Mark S. Liebermann, Chicago, Ill., for appellee. Gottlieb & Schwartz, Chicago, Ill., of counsel.

Before HASTINGS, Chief Judge, and KNOCH and KILEY, Circuit Judges.

KNOCH, Circuit Judge.

Vernon Hills, Inc., is the subject of proceedings for reorganization filed December 4, 1962, under Chapter X of the Bankruptcy Act, Title 11 U.S.C.A. § 501 et ·seq.

Early in June, 1963, the attorney for Service Savings and Loan Association, petitioner-appellant in Appeal No. 14854, hereinafter called "Service," ascertained, while checking some real estate bills, that the legal description set out in Service's mortgage, security for a loan made to the debtor herein, included only a part and not all of the eighteen holes of the Vernon Hills Country Club golf course.

On June 19, Illinois Capital Investment Corporation, petitioner-appellant in Appeal No. 14855, hereinafter called "Illinois," sought leave of the District Court to begin foreclosure proceedings on its second and junior mortgage on property of the debtor herein. In the response to that petition, the Trustee denied that the Illinois mortgage included the entire eighteen holes of the golf course. That petition was denied.

On December 16, 1963, Charles David Maley, the duly appointed and acting Trustee of the estate of the debtor, respondent-appellee in both appeals, petitioned the District Court to determine the value of Service's security and to declare Service an unsecured creditor for the amount of its claim in excess of that value pursuant to Title 11 U.S.C.A. § 597. The District Judge referred the matter to a special master for hearing, report and recommendations.

During the pendency of the hearing relative to valuation, on January 9, 1964, Service petitioned to reform its mortgage to include the whole of the eighteen holes of the golf course; and on January 20, 1964, Illinois filed a similar petition to reform its second and junior mortgage on the same property.

Both reformation petitions attributed the failure to include the whole of .the eighteen holes of the golf course in the legal descriptions of the mortgages to mutual mistake of fact arising from scrivener's error.

After the parties rested and proofs were closed, on May 4, 1964, Service was granted leave to file an amended and supplemental petition based on allegations of fraud and deceit, to which the Trustee filed a response.

Meanwhile, on February 14, 1964, Federal Savings and Loan Insurance Corporation, as assignee of Hillside Savings and Loan Association, hereinafter called "Federal," filed its answer to Service's reformation petition alleging, inter alia, that Federal was the owner and holder of certain mortgages constituting first and prior liens on a part of the property sought to be included in the Service mortgage. The resolution of the issues thus raised was held in abeyance pending the outcome of the reformation petitions.

The Special Master, with the consent of the parties, considered both the valuation and reformation matters, although for the purpose of taking evidence and hearing oral arguments the valuation petition was heard separately. Extensive testimony was heard, numerous exhibits offered and the case tried without a jury from time to time for about four months.

The Special Master found:

(1) that neither Service nor Illinois proved by clear and convincing evidence that a mutual mistake of fact occurred in setting out the legal descriptions in the mortgages;

(2) that Service failed to prove by clear and convincing evidence that the debtor or its agents engaged in fraudulent or deceitful conduct or by statements, misrepresentations, acts or conduct, misled or perpetrated a fraud on Service;

(3) that the legal description in the Service mortgage was prepared by the debtor at the request and with the consent of Service, but that Service did not rely on its accuracy;

(4) that the Illinois mortgage was prepared by Illinois's counsel who copied the legal description contained in the Service mortgage;

(5) that neither Service nor Illinois proved by clear and convincing evidence that the parties intended or agreed that

the property now sought to be included by reformation of the mortgages was to be covered.

The Special Master recommended that the petitions to reform be denied. The District Court affirmed and approved the report in all respects, overruling and denying objections and exceptions filed thereto. Service was classified as a secured creditor to the extent of $730,000, the value of the security set out in the mortgage, and as an unsecured creditor for the balance of its claim. Illinois was classified as an unsecured creditor for the entire amount of its claim. These appeals followed.

Service contends that there was not even a scintilla of evidence that would suggest that anything was contemplated by Service or by the debtor other than to secure the Service loan by a first mortgage on the motel, restaurant, country club building, and the entire eighteen holes of the golf course; that the country club building would have no value if unconnected with a complete golf course.

The mortgage in the amount of $850,000, which Service sought to reform, was a refinancing of an earlier indebtedness evidenced by a note dated November 15, 1960, for $700,000 and secured by a mortgage containing the same legal description which was merely copied for the $850,000 mortgage.

The initial negotiations occurred in August, 1960, between William Szarabajka, president of Service, and one John Perisich, an agent and mortgage finder for debtor, who were brought together through Kenneth LaVoie, who was paid $42,000 for making this contact, according to Mr. Perisich's testimony. In addition, Mr. Perisich's own fee for his activities in connection with the Service mortgage for $700,000 was $21,000, plus $22,500 on the refinancing, or a total of $85,500 for this financing.

Mr. Perisich gave Mr. Szarabajka an appraisal dated July 15, 1960, which purported to value the golf course and two nonexistent tennis courts. The appraisal contained a map which omitted a part of the golf course and a legal description which was materially different from the legal description which appeared in the mortgage.

Joseph W. Nowak, who was Service's attorney at the time, testified that he noted that the appraiser didn't vouch for the legal description but suggested its submission to a licensed surveyor. Mr. Nowak testified further that at a meeting with Mr. Perisich and Mr. Szarabajka, he advised securing a legal description with a survey which would locate all of the improvements intended to be conveyed with the mortgage.

Later Mr. Szarabajka, Mr. Nowak, Mr. Perisich and Quinn Hogan, president of the debtor, met at the club and viewed the premises, including homes which surrounded the golf course.

About a week later, according to the testimony of Mr. Perisich, they all met at Service's offices and a loan application without legal description was presented by Mr. Hogan. Mr. Nowak repeated his request for a legal description and survey, and Mr. Szarabajka instructed Mr. Hogan to get those and to prepare the mortgage document.

Mr. Nowak received certain loan papers, including an undated mortgage copy and a sheet of paper containing a legal description, from Mr. Perisich, and finding no plat of survey in Service's file, called on the debtor for a survey against which to check the legal description. He then went out of the State on other business. This was about November 11, 1960. The Notary Public certified that the mortgage was signed November 15, 1960.

Three days later a signed mortgage with an attached piece of paper containing the legal description which is here sought to be reformed was delivered to the Lake County office of the Chicago Title and Trust Company to be returned to the debtor after recording.

Charles Rood, Chief Title Officer, testified that the mortgage was recorded November 18, 1960, and a title report mailed November 23, 1960.

At the country club meeting, when the premises were viewed, Mr. Hogan had

told Mr. Szarabajka that the initial $700,-000 was sought to refinance existing mortgages. The closing statement of Service shows as paid out of the proceeds of the initial mortgage for $700,000:

| | |
|---|---|
| Home Federal Savings & Loan Association | $94,212.45 |
| North Shore National Bank of Chicago | 203,375.00 |
| Amalgamated Acceptance Corporation | 22,416.67 |

The debtor had assumed the Home Federal mortgage from its predecessors. The other two were obtained within three months prior to the Service mortgage. The legal description contained in these last two was exactly the same as that in both of the Service mortgages.

The president of the Moline National Bank, William R. Wandry, testified that he was president of North Shore National Bank of Chicago at that time. He recalled discussions with Mr. Hogan in negotiating the loan within the two months prior to the loan, and he identified a contemporary memorandum of the discussions concerning assets to be given as security for the North Shore loan. There was no discussion of the golf course as such. He testified that Mr. Hogan was seeking interim financing; that Mr. Hogan stated he was doing some permanent financing on a long-term basis.

Mr. Hogan who was called as a witness for the petitioners herein testified that he intended to deed to North Shore everything they wanted as security, that Service was supposed to have the same security; that all the mortgagees were supposed to have the same security. He also said that he imagined that he intended to mortgage the golf course to North Shore and also to Service.

Andrew C. Hamilton, of Kirkland, Ellis, Hodson, Chaffetz and Masters, testified that as attorney for North Shore he prepared the loan papers, drafting the legal description in accordance with instructions from Mr. Wandry, president of North Shore, who never told him that the mortgage was to cover the entire golf course. He received a plat of survey dated August 18, 1960, from the debtor together with a Lawyer's Title Company owner's policy among other documents.

This would appear to be the most likely source of the legal description which is now sought to be reformed.

In support of its allegations of scrivener's mistake, Service sought to elicit evidence that the legal description was orally recited over the telephone by Richard G. Gremley, who prepared the August 18, 1960, survey. Mr. Hogan testified that Mr. Gremley must have given it over the telephone because he was the only surveyor the debtor used, that he imagined it would have had to be that way, that someone in the debtor's office frequently called the surveyor for legal descriptions. Although Mr. Hogan had no recollection of actually making this call himself, he thought that he probably had telephoned Mr. Gremley and asked for the legal description for the golf course, and then had turned the call over to the girl at the switchboard or to one of the typists to take the dictation from Mr. Gremley and then type up the legal description. Mr. Hogan had no present recollection as to whether he had merely copied the description for the Service mortgage from the North Shore mortgage.

Mr. Gremley himself testified that he did not remember preparing the legal description in the mortgage, or the telephone call, but that he could not say that he did not prepare the description. He testified that he or someone in his office often did read legal descriptions over the telephone, and he could not rule out the possibility that such had occurred here.

About one month after the North Shore mortgage, which had been returned to the debtor after recording, the debtor obtained the Amalgamated mortgage, and less than two months later, the $700,000 Service mortgage, both containing the same legal description as the North Shore mortgage, as did the later $850,000 Service mortgage and the Illinois mortgage.

The property sought to be added by reformation includes the rear portions of Lots 3 to 14, Vernon Hills Subdivision,

and of Lots 2 to 5, Vernon Hills Subdivision Unit 2, all of Lots 6, 7 and 8 of Vernon Hills Subdivision Unit 2, and part of a dedicated road which the debtor didn't own.

A substantial part of this property was already mortgaged of record to Hillside Savings and Loan Association and remained of record until very recently when released by a compromise between the Trustee and Federal Savings and Loan Insurance Corporation, Hillside's assignee.

Service contends that the evidence clearly shows that the entire golf course was to be included in the mortgage. In addition to the evidence indicated above, Service relies largely on the following testimony. Mr. Perisich testified that he was introduced to one Nate Brown, an insurance agent, by Mr. LaVoie, and that Mr. Brown in turn introduced him to Mr. Szarabajka. He testified further that Mr. Brown told Mr. Szarabajka that Vernon Hills, Inc., was "seeking a first mortgage loan on the golf course, which included the clubhouse, eighteen holes, restaurant, motel, the entire complex," and that he, Mr. Perisich, left two appraisals, one on the motel and the other on the golf course, including all eighteen holes, for Mr. Szarabajka's consideration.

Mr. Nowak testified that when he and the other gentlemen visited the club, Mr. Hogan pointed out the property to be included and stated that he had an eighteen-hole golf course, and showed them the whole course. He also testified that when he met with Mr. Perisich and Mr. Szarabajka at the Service offices, Mr. Perisich brought a plat with the improvements on the club property penciled in, that there was "a line drawn with a sort of pennant, and in talleying these pennants it would indicate there was eighteen holes on the golf course." This was the same meeting at which the appraisal was presented to Mr. Nowak who observed, as noted above, that the appraiser did not vouch for the legal description.

When the loan application was filed, it referred to "a country club building and golf course." The resolution of the debtor's Board of Directors authorized borrowing $700,000 "on the golf course, club house, and country club facilities and restaurant and motel."

During this whole period Mr. Nowak was suffering from a serious throat condition and about to undergo surgery. This limited his participation in the negotiations.

If there was not a mutual mistake in typing up the legal description in the $700,000 mortgage, then Service contends that there was concealment or deception by the debtor.

As must appear from the brief indications above, there were contested issues of fact and these turned in part on oral evidence of the witnesses. Service points out that Mr. Hogan and Mr. Perisich, agents of debtor, testified for Service that the entire golf course was to be included. But the evidence of these witnesses contained inconsistencies and discrepancies. Mr. Hogan, for example, testified that at the time when the initial Service mortgage was made, he believed that the Hillside mortgages did not include those portions of the house lots on which some of the golf course holes were situated. This is contradicted by a letter from Mr. Hogan, dated about one month prior to the $700,000 Service mortgage, in which he lists the lots as covered by the Hillside mortgages and indicates that a part of the golf course is located on those lots.

Mr. Perisich, for example, testified several times that Mr. Hogan gave him a financial statement late in October or early in November, 1960. Mr. Szarabajka thought that was the statement which he saw during the negotiations. He said he saw such an audit and that he knew of no other audit in Service's files. Yet the accountant whose office prepared the audit testified that it was issued in mid-December, 1960, after the Service mortgage was recorded in mid-November of that year.

█ █ The Special Master heard and saw these witnesses. It is axiomatic that the determinations as to credibility made by the trier of the facts are entitled to

great weight. His findings of fact are binding on the District Court unless clearly erroneous. Federal Rules of Civil Procedure, Rule 52(a), 53(e) II, General Order 47, Title 11 foll. § 53, U.S.C.A.; Ferroline Corp. v. General Aniline & Film Corp., 7 Cir., 1953, 207 F.2d 912, 920.

■ The evidence in support of a scrivener's error is so vague and uncertain that we cannot consider it erroneous for the Special Master, and the District Court, to have found it lacking in the clear and convincing character needed to support reformation of an agreement which had been reduced to writing and executed by responsible men experienced in mortgage matters. Harley v. Magnolia Petroleum Co., 1941, 378 Ill. 19, 27, 37 N.E.2d 760, 137 A.L.R. 900 and cases there cited.

The evidence on which Service relies includes general and vague references to a golf course but Service never procured a certified plat of survey as urged by its own attorney, permitting the debtor to prepare the loan papers. Although Service now contends that it always believed it was lending its funds on the security of a complete eighteen-hole golf course, it is at least equally reasonable to conclude that at the time Service deliberately refrained from accepting a mortgage which covered real estate encumbered by a prior lien not owned by Service. To have done otherwise might have involved Service in a violation of Illinois statute. Ill.Rev.Stat.1963, Ch. 32, §§ 791(b) (2), 793(c).

Security argues that the Trustee may not oppose reformation on the ground that Service was negligent in failing to secure a certified plat or survey, or performed an ultra vires act, and that the evidence does not conclusively prove that Hillside's mortgages would have been superior liens had Service's mortgage read as sought to be reformed. Nevertheless these circumstances do provide support for the findings of the Special Master that Service failed to prove either mistake or fraud.

Mr. William G. Seils, of the firm of Arvey, Hodes & Mantynband, testified that he prepared the Illinois mortgage and that the legal description was copied from the Service mortgage. Mr. Hogan testified that he intended to give Illinois the same security as Service. The parties agreed that Mr. Hogan's testimony respecting the Service mortgage would be considered as part of the Illinois case. The loan agreement with Illinois states that the second mortgage will include "all of the property" of the debtor, but Illinois makes no such broad claim and does not charge fraud.

■ With respect to costs, we find no abuse of the District Court's discretion in taxing costs against the unsuccessful parties.

We have considered all other arguments put forward by Service and Illinois but remain convinced that the decisions of the District Court must be affirmed.

Affirmed.